No. 88-386

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

---

NORTHERN BORDER PIPELINE COMPANY,
a Partnership,

Plaintiff and Appellant,

-vs-

THE STATE OF MONTANA, DEPARTMENT OF REVENUE,
OF THE STATE OF MONTANA, et al.

Defendants and Respondents.

---

APPEAL FROM: District Court of the Seventeenth Judicial District,
In and for the County of Valley,
The Honorable Leonard Langen, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Michael E. Webster argued and Ronald Lodders; Crowley
Law Firm, Billings, Montana

For Respondent:

Hon. Marc Racicot, Attorney General, Helena, Montana
Clay Smith argued, Asst. Atty. General, Helena
David W. Woodgerd, Dept. of Revenue, Helena, Montana
David L. Nielsen, County Attorney, Glasgow, Montana
James A. McCann, County Attorney, Wolf Point, Montana

For Amicus Curiae:

Reid Peyton Chambers; Sonosky, Chambers & Sachse,
Washington, DC  and Ray F. Koby; Swanberg, Koby and
Swanberg, Great Falls, Montana   (Assiniboine and Sioux
Tribes)

---

Submitted: February 10, 1989

Decided: April 20, 1989

Filed:

_____
Clerk

where a portion of it crosses "trust lands" (lands held by the Federal Government in trust for members of the Indian tribes) within the Fort Peck Indian Reservation. In order to build the line on trust lands, Northern Border was required to obtain a right-of-way grant from the United States Department of the Interior through the Bureau of Indian Affairs. Prior written consent was also required from the Assiniboine and Sioux Tribes (Tribes) with respect to tribal trust lands, and from individual tribal members with respect to lands held in trust for them.

The portion of the pipeline running through reservation trust lands is located in Valley County (12.92 miles), and in Roosevelt County (20.88 miles). From the time of its construction, the pipeline has been subject to a property tax centrally assessed by the State. The assessed tax is levied and collected by the Counties. Northern Border has paid this tax without protest, except for a disagreement in 1986 as to the proper valuation of the line.

In 1987, the Tribes instituted a "utility tax," which is basically a property tax levied on utilities. The amount of the tribal tax related to the pipeline running beneath trust lands was $1,112,396.56 in 1987. The 1987 property tax assessed by the State resulted in Valley County collecting a total of $2,305,346.05 ($370,794.56 of which related to trust lands), and Roosevelt County collecting $2,211,825.37 ($535,243.85 of which related to trust lands).

Northern Border filed its Application for Temporary Restraining Order and Complaint for Injunctive Relief on November 23, 1987, requesting that the District Court prevent the State from assessing, levying or collecting property taxes on the portion of the line running beneath trust lands. The amount of Northern Border's 1987 property tax thereby challenged was $906,038.41. The District Court issued a

3

Mr. Justice R. C. McDonough delivered the Opinion of the Court.

This appeal involves a dispute over property taxes assessed and levied against a natural gas pipeline owned by Northern Border Pipeline Company (Northern Border). Northern Border appeals from the summary judgment of the District Court of the Seventeenth Judicial District, Valley County, upholding the power of the State of Montana to impose the disputed tax. We affirm.

Northern Border frames six issues on appeal:

1. Does the factual record before the District Court show that Northern Border was entitled to summary judgment?

2. Did the District Court err in failing to find that the challenged taxes have been preempted by federal law?

3. Did the District Court commit error in failing to find that the challenged taxes are illegal because they interfere to an impermissible extent with the Tribes' sovereign rights of self-government?

4. Did the District Court err in determining that the State has a sufficient nexus with the trust-sited property interests of Northern Border to support imposition of the taxes here challenged?

5. Do the challenged taxes constitute an unreasonable burden on interstate commerce?

6. Do the acts of the State in attempting to assess, levy and collect the challenged taxes conflict with the Enabling Act of the State of Montana and the Constitution of the State?

The pipeline in question carries natural gas from Alaska to the lower 48 states. Northern Border owns the line between the Sasketchewan/Montana border and Chicago. Approximately 181 miles of the line is located in Montana,

temporary restraining order enjoining collection of the challenged tax, and later granted a preliminary injunction. The parties then filed cross-motions for summary judgment with supporting affidavits. The District Court granted the State's motion and denied Northern Border's.

At the outset, we note two important features of this case that have shaped our approach to reviewing the District Court's decision. First, the basis for this suit is a state tax levied against property located on an Indian reservation, but owned by non-Indians. The arguments involved are complex and sometimes confusing, due to the legal principles involved and the attempts of counsel to emphasize particular aspects of those principles.

Second, this case was decided below on a motion for summary judgment. The judge sat without a jury, no testimony was taken and the facts are relatively uncontested. The scope of our review is therefore much broader than in other appeals. We are able to make our own examination of the entire case and make a determination in accordance with our findings. Johnson v. Division of Motor Vehicles (Mont. 1985), 711 P.2d 815, 42 St.Rep. 2045.

Given the complexity of the arguments and the resulting risk of confusion, we have taken an approach to this case that differs from that proposed by Northern Border. Northern Border's challenge to the taxes imposed by the State rests on three basic grounds: (1) preemption by federal law, (2) violation of the United States Constitution and (3) violation of the Montana Constitution. While the issues framed by Northern Border have relevance, they are component questions of these three main issues.

## I. Federal Preemption

Northern Border argues that the pipeline running through reservation trust lands is subject to federal laws and

4

regulations, with which the challenged state property tax will interfere to an impermissible extent. Both sides agree that the test to be applied in this case was set forth by the United States Supreme Court in White Mountain Apache Tribe v. Bracker (1980), 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665. The White Mountain opinion outlines the relationship among the Indian tribes, the Federal Government and the several states.

Indian reservations are a creation of federal law. Indian activities and property on a reservation generally come within the sphere of federal authority, except in matters where an Indian tribe has retained its tribal sovereignty and is self-governing. A state's laws are therefore generally inapplicable where the conduct of Indians on the reservation is concerned. White Mountain, 448 U.S. at 143-44. Where a state seeks to have its laws apply to the activities or property of non-Indians on a reservation, the separation of authority is less clear.

In White Mountain, the State of Arizona sought to impose fuel use and motor carrier license taxes on trucks owned and operated by a non-Indian company, but used in furtherance of a contract with a tribal enterprise engaged in logging operations on a reservation. The company and the tribe challenged the portion of Arizona's tax that applied to logging and hauling activities carried out exclusively on the reservation, using tribal and federal roads.

The Supreme Court set out essentially a two-pronged test for preemption, because it found that two "independent but related barriers" could preclude a state from asserting its authority on a reservation. First, the exercise of state authority could be preempted by directly applicable federal statutes or regulations. Second, the state could unlawfully infringe on the right of Indians to make their own laws and

5

be governed by them. White Mountain, 448 U.S. at 142 (citing Warren Trading Post Co. v. Arizona Tax Comm'n (1965), 380 U.S. 685, 85 S.Ct 1242, 14 L.Ed.2d 165; and Williams v. Lee (1959), 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251, respectively).

The Supreme Court noted that these two barriers are independent, because either standing alone could be a sufficient basis for finding a state law inapplicable. They are also related, because the right of tribal self-government is ultimately subject to the power of Congress, and thus is effectively a creature of federal law just as are statutes and regulations. We will therefore treat these two separate questions as elements of the same federal preemption analysis. Because the interaction of the various governmental interests in each case will vary, the White Mountain test calls for a "particularized inquiry into the nature of the state, federal and tribal interests at stake," which are then balanced to determine whether the state law is preempted. White Mountain, 448 U.S. at 145.

A. Federal Statutes and Regulations

Northern Border asserts that the challenged state tax in this case is preempted by two directly applicable bodies of federal law. The first of these is comprised of statutes enunciating the Federal Government's goal of promoting tribal self-sufficiency and economic development, specifically, the Indian Financing Act of 1974, 25 U.S.C. §§ 1451 et seq.; the Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. §§ 450 et seq.; and the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461 et seq. For example:

> The Congress hereby recognizes the obligation of the United States to respond to the strong expression of the Indian people for self-determination ... through the establishment of a meaningful Indian self-determination policy which

6

will permit an orderly transition from Federal domination of programs for and services to Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services.

25 U.S.C. § 450a.

It is hereby declared to be the policy of Congress to provide capital on a reimbursable basis to help develop and utilize Indian resources, both physical and human, to a point where the Indians will fully exercise responsibility for the utilization and management of their own resources and where they will enjoy a standard of living from their own productive efforts comparable to that enjoyed by non-Indians in neighboring communities.

25 U.S.C. § 1451.

The second body of law is the scheme of regulations governing the granting of rights-of-way over Indian lands found at 25 C.F.R. §§ 169.1, et seq. The purpose of these regulations is stated in 25 C.F.R. § 169.2 as prescribing the "procedures, terms and conditions" under which rights-of-way can be granted across tribal land.

Two of the seminal cases in this area, relied upon by both parties in this case, are White Mountain and Washington v. Confederated Tribes of the Colville Reservation (1980), 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10. The result in each case was different, which allows for an examination of the interests that will cause the balance to tip one way or the other. An overview of these cases shows that the federal/tribal interest will be strongest, and the state interest correspondingly weakest, where the activity or property at issue involves only Indians and is located solely within the reservation. The reverse is true when the activity or property involves non-Indians and has effects

7

that are felt off the reservation. See White Mountain, 448 U.S. at 144; Colville, 447 U.S. at 154-57.

In White Mountain, the logging operation at issue was conducted exclusively on reservation lands, using roads built or maintained by the White Mountain Tribe and the Federal Government. The Supreme Court noted the general policy goals contained in the statutes cited above, and examined the extensive federal laws and regulations directly applicable to the logging operation. The regulations dictated, among other things, the amount of timber that could be sold, methods of cutting trees, advertising, mode of bidding, roads to be used, hauling equipment to be used, speed at which equipment could travel, and dimensions of the loads to be hauled.

The Supreme Court found Arizona's justification for its taxes insufficient to counterbalance their interference with the applicable federal regulatory scheme. Arizona did not assert a public regulatory purpose; i.e., the challenged taxes were not used to address off-reservation effects of the logging operation. The revenue raised by the taxes was used for "partially compensating the state for the use of its highways." White Mountain, 448 U.S. at 139-40. Arizona's interest in imposing the taxes was held to be slight due to the lack of a public regulatory purpose and the fact that Arizona was not providing any on-reservation services with the revenue from the challenged taxes. The logging trucks involved did not use state roads or highways.

By contrast, the Arizona taxes added a cost component to the logging operation that interfered with three facets of the federal statutory and regulatory scheme: (1) the "overriding federal objective of guaranteeing Indians that they will 'receive ... the benefit of whatever profit [the forest] is capable of yielding;'" (2) the Federal Government's ability to set fees and rates required to carry

8

out logging operations and timber sales; and (3) the tribe's ability to sustain the costs involved in following the federally-mandated sustained yield policy. The Supreme Court found that "no room remains for state laws imposing additional burdens" on the logging operation. White Mountain, 448 U.S. at 149-52.

In Colville, the tribes involved enacted ordinances authorizing the taxation of on-reservation cigarette sales. The tribes refused to collect Washington cigarette or sales taxes on the transactions. This made the price of cigarettes purchased on the reservation lower than those purchased elsewhere, and non-Indian people traveled to the reservation for the specific purpose of buying cigarettes.

The Supreme Court found this case to be in contrast to a situation (such as that in White Mountain) where the challenged tax affected value generated on the reservation by activities in which the tribes had a strong interest. "What the smokeshops offer these customers ... is solely an exemption from state taxation." Colville, 447 U.S. at 155 (contrasting Moe v. Salish and Kootenai Tribes (1976), 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96; and McClanahan v. Arizona State Tax Comm'n (1973), 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129).

The Colville tribes had argued that Washington's taxes were preempted by the policy of Indian self-sufficiency set out in the statutes quoted above. The Supreme Court held that the general policy of self-sufficiency was insufficient to outweigh Washington's interest in raising revenue through its sales and cigarette taxes. The statutes were held to be evidence of "congressional concern with fostering tribal self-government and economic development, but none [went] so far as to grant tribal enterprises selling goods to

nonmembers an artificial competitive advantage over all other businesses in the State." Colville, 447 U.S. at 155.

In the present case, both parties have examined precedent such as White Mountain and Colville closely in seeking to add weight to their respective interests. For example, in its briefs to the District Court and to this Court, Northern Border quotes an opinion of the Tenth Circuit Court of Appeals for the proposition that a state's interest in assessing a tax is "particularly minimal when it seeks to raise revenue by taking advantage of activities that are wholly created and consumed within tribal lands and over which it has no control." Indian Country U.S.A., Inc. v. State ex rel. Oklahoma Tax Comm'n (10th Cir. 1988), 829 F.2d 967, 987. Northern Border then argues that because the portion of the pipeline in question is on trust lands "over which the State has no jurisdiction," Montana's interest in raising revenue is likewise particularly minimal. This argument ignores the fact that Northern Border's pipeline--part of a system stretching from Alaska to Illinois--can hardly be characterized as "wholly created and consumed within tribal lands." It also presupposes the result of the White Mountain test, which will determine whether the State has a sufficient interest to assert jurisdiction to tax Northern Border's trust land-sited pipeline.

The State has also engaged in overstatement. For example, the State seeks to derive a rule from holdings such as Colville and White Mountain that direct interference with a particular federal regulatory scheme is necessary before preemption can be found. However, the Supreme Court in White Mountain stated that the balancing of federal, tribal and state interests was to include consideration of the broad policies that underlie relevant federal laws. White

Mountain, 448 U.S. at 144-45. While Colville held broad federal policy insufficient to preempt the state law at issue, it was nonetheless considered as the main component of the tribes' argument. Colville, 447 U.S. at 155. A specific federal regulatory scheme would yield a federal/tribal interest that weighed more heavily in the White Mountain test, but it is not a prerequisite for federal preemption.

Unlike the decisions in White Mountain and Colville, the balance of federal, tribal and state statutory and regulatory interests in this case has a narrow focus. This is not a case where an extensive set of directly applicable federal statutes or regulations leaves no room for the exercise of state authority challenged here. Nor is it a case where the Tribes are attempting to gain a commercial advantage by marketing an exemption from state taxation.

As to the federal/tribal interests, one basis for Northern Border's argument merits much more weight than the other. The weaker basis is the scheme of federal regulations concerning right-of-way grants across reservation lands. The State and the District Court agree that this regulatory system is fairly extensive, but Northern Border makes only bald statements that the State's tax is preempted by the regulations, without showing any actual relationship between the two.

The activity being regulated is the granting of rights-of-way. The State does not seek to tax the right-of-way itself or any facet of the granting process. The State's tax is on the pipeline; the property of Northern Border that was not put in place until after the right-of-way grant was obtained. While it is conceivable that some decision made regarding a future right-of-way grant might be somehow affected by the tax, Northern Border has advanced no argument as to what that effect might be. The regulations

11

are at best tangentially related to a property tax on a pipeline sitting in an existing right-of-way. The federal/tribal interests represented by the right-of-way regulations are slight, and can be accorded little weight.

Northern Border's stronger argument is based on the federal policy of encouraging tribal self-sufficiency set out in the statutes quoted above. In its initial brief to the District Court, Northern Border argued that the Tribes' utility tax ordinance, by providing revenue for the Tribes to use in providing services on the reservation, was effectively furthering this federal policy. Northern Border argues that the State's tax makes it more expensive for utilities to locate property on trust lands than it is elsewhere. According to Northern Border, this gives the State the power to control a major factor in any decision to locate business property on the reservation. This would interfere with the federal self-sufficiency policy by inhibiting the Tribes' ability to manage their own resources (see New Mexico v. Mescalero Apache Tribe (1983), 462 U.S. 324, 103 S.Ct. 2378, 76 L.Ed.2d 611), and by reducing the revenue available for providing reservation services. However, as the State is quick to point out, no present injury to tribal revenues resulting from the State's tax has been shown.

Northern Border presents factual support for its position in the form of affidavits from utility company executives who state that the double tax burden present on trust lands would affect any decision by their companies regarding location of facilities there. The State attacks these affidavits as speculative and irrelevant. While there is some merit to the State's attack, the prospective nature of Northern Border's argument does not render it inconsequential. The law recognizes that one need not wait for a threatened injury to manifest itself before seeking

12

injunctive or declaratory relief. Crow Tribe v. State of Montana (9th Cir. 1987), 819 F.2d 895, 903.

The State's interest in assessing the challenged tax is similar to the Tribes'. The State argues that substantially all of the revenues derived from the tax stay in Roosevelt and Valley Counties, with a full 71% being used to fund school districts servicing tribal members living on the reservation. The State also notes that the Counties maintain some of the roads on the reservation, and that the State has law enforcement responsibilities for some crimes committed by non-Indians on the reservation, including acts of vandalism against Northern Border's property.

The balance of the competing interests here as they apply to preemption by federal laws thus narrows to the question of providing services. Although both sides have advanced viable interests to be weighed in the White Mountain test, the State's interest in funding the school districts involved here and providing local services outweighs the federal/tribal interests asserted by Northern Border. The possible future injury posed by Northern Border has less impact than what would occur were we to hold the State's tax to be preempted. For example, any failure by the State to provide educational opportunity for reservation children would violate both federal and state law. See, e.g., Equal Educational Opportunities Act of 1974, 20 U.S.C. §§ 1701, et seq.; Sec. 1, Art. X, Mont.Const.; §§ 20-5-103 and 20-5-108, MCA. The deciding factor is thus the greater present interest the State has in providing services to reservation residents. We therefore hold that the challenged tax is not preempted by federal statutes or regulations.

B. Tribal Self-Government

Northern Border also argues that the State's tax interferes to an impermissible extent with the Tribes'

13

sovereign rights of self-government. According to Northern Border, the interference with prospective tribal tax revenues wrought by the State's tax requires a finding of preemption under the second prong of the White Mountain test, because taxation is chief among the powers of sovereignty exercised by an Indian tribe.

The District Court's order noted that the Tribes, and not Northern Border, are the more appropriate parties to determine whether their interests will be harmed in the future by the challenged tax. On appeal, the State amplifies this point, and argues that Northern Border lacks standing to raise a self-government claim. The State points to Olson v. Department of Revenue (Mont. 1986), 726 P.2d 1162, 1166, 43 St.Rep. 1916, 1920, where this Court adopted federal principles of standing for suits of all kinds, especially court challenges based on alleged constitutional or statutory violation. In Olson, we recognized two bases on which standing rests. One of these is "judicial self-restraint imposed for reasons of policy." Olson, 726 P.2d at 1166. The policy at issue here is the general reluctance of courts to determine the rights of persons who are not parties to the suit: "... the avoidance of the adjudication of rights which those not before the Court may not wish to assert, and the assurance that the most effective advocate of the rights at issue is present to champion them." Duke Power Co. v. Carolina Environmental Study Group., Inc. (1978), 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595, 616.

Northern Border argues that it has standing to bring the claims advanced in this suit by virtue of its taxpayer status and the direct economic injury it suffers from the double taxation. Northern Border further argues that this Court has previously addressed self-government issues in cases where no Indian tribes were parties (citing Burlington Northern

14

Railroad v. Department of Public Services Regulation (Mont. 1986), 720 P.2d 267, 43 St.Rep. 1005; and Milbank Mutual Insurance Co. v. Eagleman (Mont. 1985), 705 P.2d 1117, 42 St.Rep. 1393). Our reading of these cases shows Northern Border's argument to be incorrect. Our decision in Burlington Northern was based on applicable federal regulations, and did not address self-government. The plaintiff in Eagleman, while technically not an "Indian tribe," was an individual who was "an enrolled member of the Fort Peck Sioux and Assiniboine Tribes." Eagleman, 705 P.2d at 1118. Northern Border also cites two recent state court decisions, one from Arizona and one from New Mexico, for the proposition that consideration of a federal preemption claim necessarily includes consideration of self-government, thereby affording standing for a non-Indian to assert a self-government claim. We disagree with these holdings, and decline to apply them.

Northern Border has standing by virtue of its taxpayer status to challenge the property tax imposed on it by the State. However, it does not have standing to assert the Tribes' sovereign right of self-government in doing so. As we noted in Olson, the principle of standing requires that the plaintiff allege "'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues ....'" Olson, 726 P.2d at 1166 (quoting Baker v. Carr (1962), 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678). Northern Border cannot allege a sufficient "personal" stake in the self-government interests of the Tribes to gain standing on this claim. Having so found, we will not address the claim's merits.

15

## II. Violation of United States Constitution

Northern Border asserted in its Application for Temporary Restraining Order and Complaint for Injunctive Relief that the challenged tax violates three provisions of the United States Constitution: the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and the Indian Commerce Clause. Beyond these initial allegations, we find nothing in the various briefs submitted by Northern Border that purports to be an equal protection argument. Because our review of the facts shows no objectionable classification on which to base such a claim, we will not address it further.

The Due Process Clause claim appears to be based on the alleged lack of nexus between the State and that portion of the pipeline crossing trust lands. The State characterizes this argument as specious, owing to the fact that the trust lands are located within the boundaries of Montana. Without passing on whether Northern Border has advanced a specious argument, we decline to hold that the challenged tax violates constitutional due process guarantees.

A leading U.S. Supreme Court decision on state taxation, Container Corp. v. Franchise Tax Board (1983), 463 U.S. 159, 165-66, 103 S.Ct. 2933, 2940, 77 L.Ed.2d 545, 553-54, defines nexus as a "minimum connection" between the State's income from the tax and the instate value of the enterprise being taxed. The tax here at issue is assessed based on the value of the pipeline found within the State. The revenue obtained is used to provide government services to Northern Border and tribal members, among others. This is sufficient nexus to withstand the due process challenge advanced by Northern Border.

Northern Border next argues that the State's tax is violative of the Indian Commerce Clause under the four-part

16

test established in Complete Auto Transit, Inc. v. Brady (1977), 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326. First, the test in Complete Auto applies to the Interstate Commerce Clause (Art. I, Sec. 8, cl.2, U.S.Const.), not the Indian Commerce Clause (Art. I, Sec. 8, cl. 3, U.S.Const.). Second, as the Supreme Court stated in Colville, "It can no longer be seriously argued that the Indian Commerce Clause, of its own force, automatically bars all state taxation of matters significantly touching the political and economic interests of the Tribes." It would, however, have a role in "preventing undue discrimination against, or burdens on, Indian commerce." Colville, 447 U.S. at 157. Northern Border's allegations of future injury to tribal revenues do not rise to the level of undue discrimination or burden on Indian commerce. Moreover, the Colville court found Washington's tax acceptable under this analysis because it was imposed without discrimination on all transactions within the state. The tax at issue here is alleged by Northern Border to be improper for that very reason. It is assessed against the pipeline based on its value without regard to where the line is located within the State. We find no Indian Commerce Clause violation present in this case.

III. Violation of the Montana Constitution

Northern Border's claim under the Montana Constitution is confined to the incorporation of Montana's Enabling Act in Article I:

> All provisions of the enabling act of Congress (approved February 22, 1889, 25 Stat. 676), as amended and of Ordinance No. 1, appended to the Constitution of the state of Montana and approved February 22, 1889, including the agreement and declaration that all lands owned or held by any Indian or Indian tribes shall remain under the absolute jurisdiction and control of the congress of the United States, continue in full force and

17

> effect until revoked by the consent of the United States and the people of Montana.

The delegates to the 1972 Constitutional Convention stated their intent during debate that this provision should be included to show that the Enabling Act, the "contract" between Montana and the Federal Government, was still in force under the 1972 Constitution. VII Mont. Leg. Council, Montana Constitutional Convention, 1971-1972, 2567 (1981).

The U.S. Supreme Court has held that through enabling acts, the states surrendered their proprietary interests in tribal lands, but not necessarily their governmental or regulatory authority. See Colville, 447 U.S. at 156; Draper v. United States (1896), 164 U.S. 240. As we held above, the White Mountain test establishes Montana's jurisdiction to assess the tax here challenged. That jurisdiction is not defeated by Art. I, Mont.Const.

After reviewing the record and the briefs to this Court, we find that Northern Border has not asserted federal/tribal interests sufficient to outweigh the State's interest in raising revenue for required government services encompassing reservation residents, and lacks standing to assert the Tribes' interests in self-government. We conclude that the challenged tax is not preempted by federal law. We also have been unable to find constitutional barriers to the challenged tax, and conclude that it is therefore constitutional. Given these conclusions, we hold that there is no issue as to any fact material to the State's entitlement to summary judgment.

We affirm the decision of the District Court.

_____
Justice

We Concur:

_J. A. Turnage_
Chief Justice

_John Conway Harrison_

_R. C. McDonough_

_John C. Sheehy_

_William E. Hunt Sr._

Justices

19

Mr. Justice Fred J. Weber specially concurs as follows:

I commend the majority for a well analyzed and well written opinion. Based on previous case law, the majority has properly struck a balance. Unfortunately, we have been unable to address the fundamental issue of fairness in the present case.

Here we have <u>double taxation</u>. After the completion of the pipeline, the State levied its property tax of approximately $33,000 for each mile of pipeline on the reservation. Essentially the State levied the same tax as would have been levied if the pipeline were located off the reservation in the State of Montana. Northern Border did not protest such a tax as it apparently concluded that a single tax of that nature was appropriate. After several years, the Tribes became aware of an opportunity to levy a similar property tax for their own direct use and benefit. Such a Tribal tax was appropriate because the pipeline was located on the reservation land. The Tribes then imposed their own property tax of approximately $33,000 per mile for each mile of pipeline on the reservation, resulting in an additional annual tax to Northern Border of approximately $1 million each year. Had Northern Border constructed its pipeline south of the reservation, there would only have been a single tax. Now Northern Border is trapped with a <u>double tax</u> resulting from the taxing ingenuity of two independent taxing entities. Northern Border properly feels it should have a judicial forum where this unfairness can be reviewed.

Unfortunately our state judicial system is unable to address that issue of fairness. Our jurisdiction does not extend to any control over the Tribal lands nor of the Tribe's annual tax of approximately $1 million. We therefore cannot consider the tax of both the State and the Tribes. We

20

can only state that the Montana tax is appropriate. Where does that leave Northern Border?

As a result of this opinion, Northern Border cannot obtain consideration of the issue in our State judicial system. Can Northern Border next go to the federal court system? Clearly the answer again is, "No." If Northern Border proceeds in federal court, that court system would undoubtedly agree that it has the authority to consider the tax by the Tribes only, but that it cannot consider the tax imposed by the State of Montana. The result again would be that the double tax could not be considered. Clearly this is unfair to the taxpayer.

Northern Border argues that the double tax will adversely effect the economic development of the reservation. The State argues that the issue cannot be presented by Northern Border as a taxpayer because this is a matter which can be presented only by the Tribes who are not parties to the action. It appears that the majority is correct in not addressing the issue as to the adverse effect on the economic development of the reservation. Again there is an element of unfairness.

Without question there will be an impact on the reservations of Montana in the future. Economic development on the Indian reservations will be reduced. Non-Indians, whether corporate or individual, will not construct taxable property on an Indian reservation if it is possible to place that property outside a reservation boundary. The message to the business community is to avoid transactions on the reservations which may be subject to such a double tax. Tragically the result will be a greater separation of the Indian reservations from the remainder of the State of Montana.

Montana lacks the power to address all aspects of this dilemma. It becomes one more unfortunate aspect of the

Indian problem which remains to be addressed by the Congress of the United States.

I concur in the majority opinion. Yet I also conclude that justice has been denied.

_____
Justice