JUSTICE WEBER
delivered the Opinion of the Court.
This case arose from a criminal proceeding in Glacier County. The information charged 58 counts of misdemeanor conspiracy in violation of § 45-4-102(1), MCA, involving agreements to conduct illegal gambling activities at the Montana Restaurant and Casino on the Blackfeet Indian Reservation in Browning, Montana. Defendants moved to dismiss for lack of jurisdiction. The District Court for the Ninth Judicial District, Glacier County, denied the motion. This Court accepted supervisory control in order to determine the jurisdictional issue before trial. We affirm.
The issues before us are:
*514 1. For purposes of criminal jurisdiction, is a person an “Indian” if he has no Indian ancestry but has been adopted by an Indian family and raised on the reservation?
2. Does the State of Montana have jurisdiction over non-Indian defendants for crimes committed on the reservation where there is no Indian victim?
3. Does the State of Montana have authority to regulate gambling on the reservation?
Carl Kipp, Bob Juneau and defendant, Don Juneau operated the Montana Restaurant and Casino on the Blackfeet Reservation in Glacier County, Montana. The Blackfeet tribal business permit was in Carl Kipp’s name. It was stipulated that Carl Kipp and Bob Juneau are Indians. Don Juneau’s Indian status is at issue.
On November 9, 1988, the Glacier County Attorney, filed an information charging Stanford R. Poll (Poll), Arthur A. Lindlief (Lindlief) and Don Juneau with 58 counts of misdemeanor conspiracy in violation of § ’45'-4-102(l), MCA, involving agreements to conduct illegal gambling activities at the Montana Restaurant and Casino (Casino) in Browning, Montana. All offenses are alleged to have occurred between May 1,1987, and June 1,1988. The information charged the defendants with conspiring with Carl Kipp.
On February 23,1989, defendants Lindlief and Poll filed a motion to dismiss the information for lack of jurisdiction because of (a) the exclusive territorial jurisdiction of the Blackfeet Tribe; (b) the sovereignty of the Blackfeet Tribe; (c) the preemption by the federal government under Article VI of the United States Constitution and controlling jurisdiction over all Indian affairs; and (d) the preemption by the Blackfeet Nation of jurisdiction over business activities within the exterior boundaries of the Blackfeet Reservation.
The State opposed the motion arguing that all three defendants — Poll, Lindlief and Don Juneau, were non-Indian; that the Casino was owned and operated by the defendants and not the Tribe; and the Tribe had not adopted any comprehensive scheme of legislation authorizing, controlling or regulating gambling on the Blackfeet Indian Reservation, whether by Indians or non-Indians.
Lindlief and Poll challenged the State’s assertion concerning Don Juneau’s non-Indian status and further contended that their criminal liability was predicated solely on the conduct of individuals who were Indians not subject to state jurisdiction and that the Casino was being operated pursuant to a tribal business license and gambling permit.
*515 The District Court denied the motion to dismiss, however, urging this Court to accept an application for an appropriate writ in order to determine the jurisdictional question in advance of trial. Subsequently, Lindlief filed a petition for a writ of supervisory control with this Court. This Court denied the petition on the grounds there was not an adequate factual record upon which it could exercise supervisory control.
The District Court held an evidentiary hearing on May 19, 1990. Subsequent to the hearing, the parties again submitted briefs arguing the jurisdiction of the state court. The District Court again denied the defendants’ motion to dismiss.
On December 31, 1991, Poll, Lindlief and Don Juneau again petitioned this Court to issue a writ of supervisory control. On March 10, 1992, this Court accepted jurisdiction of the application for writ of supervisory control to determine the jurisdictional issue before trial. Additional briefing was ordered and the case was orally argued before this Court on September 2, 1992.
I
For purposes of criminal jurisdiction, is a person an “Indian” if he has no Indian ancestry but has been adopted by an Indian family and raised on the reservation?
It was stipulated by the parties that Lindlief and Poll are not Indians. Therefore, this issue centers on defendant Don Juneau. Don Juneau was born of non-Indian parents but later adopted by an Indian, Benton Juneau. Don Juneau was raised on the Blackfeet Reservation and has lived and worked there all his life. Don Juneau testified that he is not enrolled as a member of any federally recognized Indian tribe; he does not vote in Indian elections; he does not receive any per capita federal benefits as an Indian; and, he has never held a Tribal office. He is married to a full-blooded member of the Rocky Boy Tribe and has children that are half Indian.
Defendants maintain that Don Juneau is an “Indian” for purposes of criminal jurisdiction. They maintain that Congress has not defined “Indian” as it is used in criminal jurisdiction statutes. They contend that since Don Juneau was adopted by Indian parents, under Montana adoption laws, he is also Indian. Section 40-8-125(1), MCA, provides:
After the final decree of adoption is entered, the relation of parent and child and all the rights, duties, and other legal consequences *516 of the natural relation of child and parent shall thereafter exist between such adopted child and the adoptive parents adopting such child and the kindred of the adoptive parents.
Under this statute, the adopted child joins the adoptive family as if born to them. Don Juneau’s father is 5/8 Indian. Thus, Don Juneau maintains that under the above statute, he is 5/16 Indian and therefore, is an “Indian” under federal and state law.
Defendants maintain that for purposes of criminal jurisdiction, “Indian” is a status, not a racial classification. United States v. Indian Boy X (9th Cir. 1977), 565 F.2d 585 (The Ninth Circuit based federal jurisdiction on residence and enrollment without mention of the percentage of Indian blood); St. Cloud v. United States (D.S.D. 1988), 702 F.Supp. 1456 (The court noted that Indian blood alone was not sufficient to warrant criminal jurisdiction because jurisdiction over Indians on reservations was based on status, not race).
Defendants contend that although Don Juneau is not a tribal member and he has no Indian blood, everything else about his life is Indian; he was adopted by an Indian; attended Indian schools; practiced the Indian religion; participated in tribal customs; married an Indian; has Indian friends; and, has Indian children. Thus, defendants urge that Don Juneau is an Indian and meets the status of Indian for criminal jurisdiction purposes.
The State maintains that criminal jurisdiction of the state court over Don Juneau, is dependent upon a determination of Don Juneau’s status as a non-Indian, citing State v. LaPier (1990), 242 Mont. 335, 790 P.2d 983, where this Court adopted the two-prong test of United States v. Rogers (1845), 4 How. 567, 16 U.S. 200, for determining whether a person has Indian status: (1) the defendant must have a significant amount of Indian blood; and (2) the defendant must have federal or tribal recognition as an Indian. Don Juneau is unable to meet either prong of the test. The State urges that Don Juneau fails the first part of the test because he has no Indian blood. He fails the second part of the test because he is not an enrolled member of the tribe and he receives no federal benefits as an Indian.
The LaPier case is controlling. Under the second prong of the LaPier test, Don Juneau was required to show that he had federal or tribal recognition as an Indian. He has failed to submit any proof to demonstrate the Blackfeet Tribe has recognized him as an Indian. As previously pointed out, he is not an enrolled member of any Indian tribe and he receives no federal benefits as an Indian. We therefore conclude that Don Juneau has failed to prove that he has received *517 federal or tribal recognition as an Indian. We conclude that Don Juneau has failed to meet the test of LaPier.
We do not find it necessary to discuss the issue from LaPier of the necessity of a significant amount of Indian blood. As mentioned, the defendants contend that such a definition is no longer appropriate because “Indian” is a status, and not a racial classification to be determined by quantity of Indian blood. Because Don Juneau has failed the second part of the LaPier test, no further discussion is necessary.
We hold that Don Juneau is not an Indian for purposes of criminal jurisdiction.
II
Does the State of Montana have jurisdiction over non-Indian defendants for crimes committed on the reservation where there is no Indian victim?
Defendants maintain that when making a determination as to whether a state has jurisdiction over particular victimless crimes committed by non-Indians within the reservation, it is necessary to examine the federal, tribal and state interests involved to determine if the particular state has been preempted.
The respondents contend that the assertion of state authority within the reservation boundaries does not infringe upon federal interests when a non-Indian commits an offense against a non-Indian. Duro v. Reina (1990), 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693; State v. LaPier (1990), 242 Mont. 335, 790 P.2d 983; State v. Snyder (Idaho 1991), 807 P.2d 55. The State notes that the defendants in this case are charged with conspiracy, and that the object of each conspiracy charged in this case is a violation of a particular gambling law of the State. The State contends that violation of the gambling laws of Montana are also victimless crimes because they are committed without injury to persons or the property of persons, and that therefore, the State has jurisdiction in this case where victimless crimes have been committed by non-Indians.
As respondent contends, it is a well-established rule of law that Indian tribes do not have criminal jurisdiction over non-Indians. In Duro, the Supreme Court stated:
Oliphant established that the inherent sovereignty of the Indian tribes does not extend to criminal jurisdiction over non-Indians who commit crimes on the reservation. Wheeler [v. United States, *518 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303] reaffirmed the longstanding recognition of tribal jurisdiction over crimes committed by tribe members.
Duro, 495 U.S. at 683-85, 110 S.Ct. at 2059. The Duro Court extended that rule by holding that tribal jurisdiction does not extend to non-member Indians. Id. 495 U.S. at 683-85, 110 S.Ct. at 2059.
Not only is Don Juneau not a member of the Blackfeet Tribe, he is not an Indian. Therefore, under Duro the Blackfeet Tribe has no criminal jurisdiction over him. We hold that the State of Montana has jurisdiction over non-Indian defendants for crimes committed on the reservation where there is no Indian victim.
Ill
Does the State of Montana have authority to regulate gambling on the reservation?
Defendants maintain that it is not the involvement of the defendants with the tribe that is at issue here, but rather the tribe’s involvement in licensing and regulating gambling on the Blackfeet Reservation. They urge that State jurisdiction would interfere with tribal sovereignty. They point out that the failure of the State to regulate gambling on the reservation will not impede the State’s ability to regulate gambling outside of the reservation. They further contend that the Blackfeet Tribe passed a gambling ordinance to license gambling and gambling establishments within the reservation; and that application of State law to gambling activities within the reservation would significantly impact tribal finances, employment opportunities and its right to self-govern.
The State maintains that the determination of jurisdiction over the gambling activities of the defendants requires a particularized inquiry into the federal and tribal interests at stake as reflected in federal law and the State interests at stake. The State maintains that it has a substantial interest in protecting its citizens from the problems associated with unregulated gambling and that Montana has strictly regulated gambling. Section 23-5-102, MCA(1987). Finally, the State contends that the exercise of state authority within the Blackfeet Reservation does not infringe upon federal or tribal interests where a non-Indian commits an offense against a non-Indian.
In White Mountain Apache Tribe v. Bracker (1980), 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665, the State of Arizona sought to apply its motor carrier license and use taxes to the Pinetop Logging Com *519 pany (Pinetop). Pinetop consisted of two non-Indian corporations doing business solely on the Reservation. Pinetop paid the taxes under protest, and then brought suit asserting that under federal law the taxes could not lawfully be imposed on logging activities conducted exclusively within the reservation or on hauling activities on Bureau of Indian Affairs (BIA) and tribal roads.
The United States was a party to the action and argued that the federal government’s regulation of the harvesting, sale and management of tribal timber through the BIA covered every aspect of logging, from the making of the initial contracts between the BIA with other parties to the ultimate disposition of the timber. The White Mountain Tribe was also a party to the action. It argued that the tax would have an adverse affect upon the Tribe’s profit and that the imposition of taxes would undermine the federal policy of assuring profits which would inure to the Tribe.
The Court concluded that federal management was so pervasive as to preclude the additional burdens resulting from the Arizona taxes and held that the Arizona taxes were preempted by federal law. It held that where a State asserts authority over the conduct of non-Indians engaging in activity on the reservation, a particularized inquiry must be made into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law. White Mountain, 448 U.S. at 145, 100 S.Ct. at 2584.
In the case before us, in contrast to White Mountain, neither the United States nor the tribe are parties to the action. The United States could have made itself a party and argued that federal law preempted State law, but it did not. Similarly, the Tribe could have entered the proceedings and argued that the State’s involvement would adversely affect the Tribe’s gambling ordinance, but it did not. Only the non-Indian defendants argue that the State’s involvement would adversely affect the Tribe’s gambling ordinance.
The dissent contends that the application of the Federal Indian Gaming Regulatory Act is a sufficient basis for denying State jurisdiction over the prosecution of the defendants. The offenses charged in the information occurred between May 1, 1987 and June 1, 1988. The effective date of the Indian Gaming Regulatory Act was October 17, 1988. Clearly the application of such an extensive regulatory act to alleged criminal activities which occurred prior to its enactment would be improper. It would violate both state and federal law with regard to ex post facto laws. As previously noted, the United States *520 could have made itself a party and argued for federal law preemption but chose not to do so. We do not find it necessary to further discuss the Indian Gaming Regulatory Act.
With regard to the claimed adverse effect upon the Tribe’s gambling ordinance the recent case of Northern Border Pipeline Co. v. State of Montana (1989), 237 Mont. 117, 772 P.2d 829, is applicable. In that case this Court considered the argument on the part of Northern Border Pipeline Company, that the tax interfered with tribal self-government. This Court stated:
Northern Border argues that it has standing to bring the claims advanced in this suit by virtue of its taxpayer status and the direct economic injury it suffers from the double taxation. Northern Border further argues that this Court has previously addressed self-government issues in cases where no Indian tribes were parties. ... Our reading of these cases shows Northern Border’s argument to be incorrect. Our decision in Burlington Northern was based on applicable federal regulations, and did not address self-government. The plaintiff in Eagleman, while technically not an “Indian tribe,” was an individual who was “an enrolled member of the Fort Peck Sioux and Assiniboine Tribes.” ... Northern Border also cites two recent state court decisions, one from Arizona and one from New Mexico, for the proposition that consideration of a federal preemption claim necessarily includes consideration of self-government, thereby affording standing for a non-Indian to assert a self-government claim. We disagree with these holdings, and decline to apply them. (Citations omitted.) (Emphasis added.)
Northern Border Pipeline Co., 237 Mont. at 128, 772 P.2d at 836.
Based upon White Mountain Apache and Northern Border, we conclude that the defendants do not have standing to raise the argument that the action of the State interferes with the self-government of the Blackfeet Reservation. We hold that the State of Montana has authority to regulate gambling by non-Indians on the reservation.
We hold that the District Court properly had jurisdiction.
CHIEF JUSTICE TURNAGE, JUSTICES HARRISON and McDONOUGH and DISTRICT JUDGE THOMAS HONZEL sitting in place of JUSTICE HUNT, concur.