JUSTICE TRIEWEILER
concurring in part and dissenting in part.
I concur with the majority’s conclusion that Donald Juneau has not offered sufficient evidence to establish that he is an Indian as that *521 status pertains to jurisdictional considerations. However, I disagree with this Court’s holding in State v. LaPier (1990), 242 Mont. 335, 790 P.2d 983, that to prove status as an Indian requires a person to prove both a significant amount of Indian blood and tribal or federal recognition. That test is antiquated and ignores the modern reality that many people of Indian descent are not enrolled tribal members for various reasons and that an inherent element of tribal sovereignty is to enroll members, regardless of their degree of Indian ancestry. However, in this case, Juneau has not proven Indian status by any criteria which has been previously recognized in case law or by federal statute.
I concur with the majority’s conclusion that Indian tribes do not have criminal jurisdiction over non-Indians. However, that lack of jurisdiction is not based upon the U.S. Supreme Court’s decision in Duro v. Reina (1990), 495 U.S. 676, 110 S. Ct. 2053, 109 L. Ed. 2d 693. Duro was concerned with tribal authority to prosecute a nonmember Indian who committed a crime on tribal land. Furthermore, regardless of Duro’s applicability to this case, it has been effectively reversed by a subsequent Congressional action which restored tribal criminal jurisdiction over nonmember Indians who break the law on tribal land. As pointed out in Mousseaux v. United States Commissioner of Indian Affairs (D.S.D. 1992), 806 F. Supp. 1433:
[On] October 24, emergency legislation was passed amending the Indian Civil Rights Act, 25 U.S.C. § 1301(2) and (3), and legislatively overruling the Supreme Court’s holding in Duro. This temporary legislation was later replaced with identical permanent legislation on October 28, 1991.
Mousseaux, 806 F. Supp. at 1440.
Indian tribes lack criminal jurisdiction over non-Indians who commit crimes on tribal land because of the U.S. Supreme Court’s decision in Oliphant v. Suquamish Indian Tribe (1978), 435 U.S. 191, 98 S. Ct. 1011, 55 L. Ed. 2d 209. In his dissent to that decision, Justice Marshall stated:
In the absence of affirmative withdrawal by treaty or statute, I am of the view that Indian tribes enjoy as a necessary aspect of their retained sovereignty the right to try and punish all persons who commit offenses against tribal law within the reservation.
Oliphant, 435 U.S. at 212, 98 S.Ct. at 1022-23.
While I agree with Justice Marshall’s dissent, and while the majority opinion in Oliphant appears to be neither historically nor legally well-founded, it does preclude tribal criminal jurisdiction over *522 non-Indians for laws broken on the reservation. However, it does not logically follow that because tribes cannot prosecute non-Indians who commit crimes in Indian country, that the State of Montana has jurisdiction over non-Indian defendants for crimes committed on the reservation. That conclusion in Issue II of the majority opinion completely ignores the traditional role of the federal government in Indian affairs.
The proper test for determining whether the State of Montana has regulatory authority over any activity committed on the Blackfeet Reservation, through its criminal statutes or otherwise, is the test set forth by the U.S. Supreme Court in White Mountain Apache Tribe v. Bracker (1980), 448 U.S. 136, 100 S. Ct. 2578, 65 L. Ed. 2d 665. In that case, the U.S. Supreme Court held that where, as in this case, “a state asserts authority over the conduct of non-Indians engaging in activity on the reservation, there must be:
[A] particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.
White Mountain, 448 U.S. at 145, 100 S.Ct. at 2584.
The majority opinion has performed no such analysis. It relies on its previous decision in Northern Border Pipeline Company v. State (1989), 237 Mont. 117, 772 P.2d 829, for its refusal to do so. For reasons I will explain later in this opinion, I decline to follow this Court’s decision in Northern Border Pipeline. However, the majority (which relies on Northern Border Pipeline) has refused to even perform that degree of analysis which is required by its previous decision. In Northern Border Pipeline, the dispute was over property taxes assessed by the State of Montana against that portion of a natural gas pipeline which traversed an Indian reservation, but which was owned by a non-Indian corporation. The portion which ran through the reservation was also taxed by the Assiniboine and Sioux Tribes. On appeal, Northern Border Pipeline argued that the State was preempted by federal regulation and that its tax interfered with the Tribes’ sovereign rights of self-government. After an extensive discussion of federal regulation in this area, the majority concluded that the tax was neither preempted by federal statutes nor regulations. However, it held that since neither the Tribes nor the federal government were parties to the suit, plaintiff did not have standing to assert the Tribes’ sovereign right of self-government.
*523 I disagree with that conclusion because under the White Mountain test, an analysis of the state, federal, and tribal interests involves related considerations which cannot be analyzed separately. After pointing out in the White Mountain decision that both federal law and the rights of reservation Indians to make their own laws may provide independent, but related barriers to the assertion of state regulatory authority, the U.S. Supreme Court stated:
The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members. They are related, however, in two important ways. The right of tribal self-government is ultimately dependent on and subject to the broad power of Congress.
White Mountain, 448 U.S. at 143, 100 S.Ct. at 2583.
Therefore, I agree with the reasoning of the Court of Appeals of Arizona in Peabody Coal Company v. Arizona (Ariz. 1988), 761 P.2d 1094, where under the same circumstances it held as follows:
The state asserts that Peabody lacks standing to argue interference with tribal sovereignty rights. We disagree. In Ramah Navajo School Bd. v. Bureau of Revenue, 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982), the United States Supreme Court stated that to determine whether a state tax may be applied to a business performed on Indian reservation land without violating federal law, federal, tribal, and state interests must be analyzed. “These interests tend to erect two ‘independent but related’ barriers to the exercise of state authority over commercial activity on an Indian reservation: state authority may be pre-empted by federal law, or it may interfere with the tribe’s ability to exercise its sovereign functions.” Id. at 837, 102 S.Ct. at 3398, 73 L.Ed.2d at 1179; White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). Because the preemption issue cannot be considered without also considering the tribal sovereignty issue[,] Peabody, of necessity, must have standing to raise the issue of interference with tribal sovereignty. [Emphasis added.]
Peabody Coal Co., 761 P.2d at 1098-99, cert. denied (1989), 490 U.S. 1051, 109 S. Ct. 1967, 104 L. Ed. 2d 435.
Therefore, I will discuss in this opinion both federal preemption and the State’s interference with the Tribe’s ability to exercise its sovereign function. However, by failing to discuss either issue, the majority has not even followed its previous decision in Northern *524 Border Pipeline which it relied on to ignore the issues raised by defendants on appeal.
FEDERAL PREEMPTION
The involvement of the federal government in the issue of gambling on Indian reservations is extensive. In 1951, Congress prohibited the possession of gambling devices in Indian country. 15 U.S.C. § 1175 (1951). In 1970, Congress enacted the Organized Crime Control Act, found at 18 U.S.C. § 1955 (1970), which prohibits and provides federal punishment for the operation of illegal gambling businesses. That Act has been previously held applicable to Indian reservations. United States v. Farris, (9th Cir. 1980), 624 F.2d 890, cert. denied (1981), 449 U.S. 1111, 101 S. Ct. 920, 66 L. Ed. 2d 839.
However, the most comprehensive federal preemption of all is contained in the Indian Gaming Regulatory Act which was enacted by Congress and became effective on October 17, 1988. Its provisions are included in 18 U.S.C. §§ 1166 to 1168 (1988), and 25 U.S.C. §§ 2701 to 2721 (1988). For purposes of considering the federal and Indian interests in this issue, it is especially enlightening to refer to the Congressional findings which precede the actual terms of the Act and are set forth at 25 U.S.C. § 2701 (1988). There, Congress stated that:
(1) numerous Indian tribes have become engaged in or have licensed gaming activities on Indian lands as a means of generating tribal governmental revenue;
(2) Federal courts have held that section 81 of this title requires Secretarial review of management contracts dealing with Indian gaming, but does not provide standards for approval of such contracts;
(3) existing Federal law does not provide clear standards or regulations for the conduct of gaming on Indian lands;
(4) a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government; and
(5) Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity. [Emphasis added.]
Based upon these policy considerations, Congress has established comprehensive and extensive control over gambling on Indian reser *525 vations, including legalization of some forms of gambling, 18 U.S.C. § 1166(c)(1) (1988); establishment of a commission to monitor gaming on Indian lands, 25 U.S.C. §§ 2704 and 2706 (1988); delegation of exclusive jurisdiction to the tribes over some forms of gambling, 25 U.S.C. § 2710 (1988); authorization for tribes to enter into negotiations with the various states for the purpose of reaching an agreement concerning the conduct of gaming activities on reservations, 25 U.S.C. § 2710(d)(3)(A) (1988); authority for tribes to enter into management contracts for the operation of gaming facilities, 25 U.S.C. § 2711 (1988); and provision for the imposition of a civil fine for the violation of any of the Act’s provisions, 25 U.S.C. § 2713 (1988). Most importantly, however, may be the provision found at 18 U.S.C. § 1166(d) (1988) which provides that:
The United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country, unless an Indian tribe pursuant to a Tribal-State compact approved by the Secretary of the Interior under section 11(d)(8) of the Indian Gaming Regulatory Act, or under any other provision of Federal law, has consented to the transfer to the State of criminal jurisdiction with respect to gambling on the lands of the Indian tribe.
The majority suggests that it need not consider this federal statute, which gives the United States exclusive jurisdiction over criminal prosecutions for violations of State gambling laws, on the grounds that the violations that are alleged in this case occurred prior to the effective date of the Federal Act. The majority reasons that to apply the unequivocal federal preemptions found at 18 U.S.C. § 1166(d) (1988) would violate constitutional provisions which prohibit ex post facto laws. However, in making this argument, the majority completely ignores its previous definition of ex post facto laws. In State v. Leistiko (Mont. 1992), 844 P.2d 97, 49 St. Rep. 1104, we established a two-part test to determine whether a statute violates the ban on ex post facto laws. In order to satisfy the test, we held that: “(1) the law must be retrospective, and (2) it must disadvantage the offender affected by it. Miller v. Florida (1987), 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351, 360-61.” Leistiko, 844 P.2d at 100. We also held that “[t]o meet the second prong of the test, the United States Supreme Court has said, ‘[i]t is axiomatic that for a law to be ex post facto it must be more onerous than the prior law.’ ” [Citation omitted.] Leistiko, 844 P.2d at 100.
*526 As applied to the facts in this case, 18 U.S.C. § 1166(d) (1988) is not an ex post facto law because it would not disadvantage the defendants. It does not change the substantive law that pertained to their conduct. It merely specifies which government has jurisdiction to prosecute them for violations of those State gaming laws that they are accused of having violated. It is merely a procedural change, and as we have previously pointed out in State v. Coleman (1979), 185 Mont. 299, 315, 605 P.2d 1000, 1011, “changes in procedure not affecting materially the rights of a defendant do not come within the constitutional prohibition” against ex post facto laws.
The provision found at 18 U.S.C. § 1166(d) (1988) is clearly procedural, and became effective on October 17, 1988. The prosecution of this action was not commenced until November 8, 1988, and if for no other reason, was prohibited by the terms of this statute. It is clear that without considering the separate tribal interests, the independent but interrelated federal interest is sufficient to preclude the exercise of state jurisdiction over the defendants in this case. The federal government has specifically recognized by statute that federal Indian policy is to promote tribal economic development and self-sufficiency and that the best way to do that is to give Indian tribes the exclusive authority to regulate gaming activity on their reservations, so long as it is not specifically prohibited by federal law and is conducted in a state where the activity is not otherwise prohibited. 25 U.S.C. § 2701 (1988). Furthermore, even when federal or state laws which regulate gambling are violated in Indian country, the federal government has exclusive jurisdiction over criminal prosecutions for those violations.
While consideration of federal interests and federal preemption is, by itself, a sufficient basis for denying state jurisdiction over the prosecution of these defendants, an examination of tribal interests in this matter, and a comparison of the State’s interest, make the error of the majority opinion even clearer.
TRIBAL INTERESTS
First of all, it is clear that the Blackfeet Tribe provided a comprehensive set of laws regulating gambling on its reservation, even before federal enactment of the Indian Gaming Regulatory Act. In 1975, the Blackfeet Tribe of the Blackfeet Reservation enacted an amendment to Ordinance No. 41 of the Blackfeet Tribal Law and Order Code of 1967. That amended ordinance permitted gambling on the Blackfeet Reservation only in accordance with the ordinance. It *527 established a gaming commission for the purpose of adopting rules and regulations pertaining to gambling and for the purpose of issuing licenses to gaming establishments. The ordinance also provided for criminal penalties for its violation.
In addition to setting up this regulatory system for gaming on the Blackfeet Reservation, the Tribal Ordinance set forth specific regulations regarding sports or gambling pools; punch boards, pull tabs, and similar devices; bingo, raffles, and keno; horse race betting and pari-mutuel betting; setting the legal age for gambling; prohibiting gambling for anything other than cash; and establishing specific procedures for criminal and civil enforcement of the ordinance. There can be no question that state regulation under these circumstances would have a strong impact “on the right of reservation Indians to make their own laws and be ruled by them.”
Furthermore, the facts in this case demonstrate that almost all of the impact of the gaming operation which the defendants were involved in was upon Indians located on the Blackfeet Reservation. The Montana Restaurant and Casino, where the activity complained of took place, was owned by three people, Donald Juneau, Bob Juneau, and Carl Kipp. Both Bob Juneau and Carl Kipp were Indians. The evidence indicated that, on the average, 90 percent of the customers who gambled on the premises were Indian. Of the 21 employees at the business, 20 were Indian. And before the business could operate, both a tribal business permit and a license for each video poker and keno machine had to be issued by the Tribal Department of Revenue. In other words, the Tribe had an interest in protecting the business’s customers, providing employment on the reservation, and in generating tribal revenue.
It is clear from all of the foregoing that tribal interests and the interests of the Tribe in self-government weigh heavily in favor of prohibiting State jurisdiction over the activities of the defendants.
STATE INTEREST
The State interest, on the other hand, is very slight, if any exists at all. The State contends that it has a substantial interest in regulating gambling throughout the State of Montana in order to protect the welfare of its citizens and avoid the domination of gaming enterprises by organized crime. It cites authority for the proposition that excessive casino gambling can produce serious harmful effects on the health, safety, and welfare of its citizens, including the *528 “disruption of moral and cultural patterns, the increase in local crime, the fostering of prostitution, the development of corruption, and the infiltration of organized crime.” Posadas de Puerto Rico Assoc. v. Tourism Co. (1986), 478 U.S. 328, 341, 106 S. Ct. 2968, 2977, 92 L.Ed.2d 266, 280.
The State’s expressed concern for the moral well-being of its citizens would be more persuasive if it was not engaged in the promotion of gambling activities through its own state lottery (see Montana State Lottery Act of 1985, Title 23, Chapter 5, Part 10, renumbered in 1991 as Title 23, Chapter 7, see specifically, § 23-7-102, MCA), and if local governments were not becoming increasingly dependent on revenue generated by off-reservation gambling enterprises. (See § 23-5-409, MCA, Bingo and Keno; § 23-5-306, MCA, Live Card Game Tables; §§ 23-5-610 and -612, MCA, Video Gambling Machines.) However, even if the State’s concerns could be accepted at face value, nothing has been accomplished in this case by the prosecution of these defendants. The State concedes that it has no authority to prosecute Indians for activities conducted on Indian land, and therefore, Donald Juneau’s partners who are Indian, continued to operate the Montana Restaurant and Casino (at least at the time of the District Court hearing in this case) in the same fashion that they have always operated it without any interference from the State. Refusal to allow the State to regulate the defendants’gambling activities on Indian land will have absolutely no adverse impact on the State’s overall regulation of gaming in the State of Montana.
CONCLUSION
For these reasons, I do not see how any responsible consideration of the factors we have been compelled to consider by the U.S. Supreme Court in White Mountain can lead to any conclusion other than that, when considering state, federal, and tribal interests in the context of this case, the exercise of State authority over the defendants for the crimes they have been charged with would violate federal law and unreasonably interfere with the tribal interests which are at stake.
Therefore, I conclude that the judgment of the District Court should be reversed and the charges against the defendants should be dismissed.
JUSTICE GRAY concurs in the foregoing concurrence and dissent.