No. 85-489

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

---

JOHN K. OLSON and CATHRYN W.
OLSON,

        Plaintiffs and Appellants,

   -vs-

DEPARTMENT OF REVENUE, an agency
of the State of Montana, JOHN LAFAVER,
Director; MARGARET MONICAL, Clerk and
Recorder for County of Park, a political
subdivision of the State of Montana; and
the STATE OF MONTANA, by MICHAEL T. GREELY
Attorney General for the State of Montana,

        Defendants and Respondents.

---

APPEAL FROM:  District Court of the First Judicial District,
                In and for the County of Lewis & Clark,
                The Honorable Henry Loble, Judge presiding.

COUNSEL OF RECORD:

    For Appellants:

        Roger Tippy argued, Helena, Montana

    For Respondents:

        Hon. Mike Greely, Attorney General, Helena, Montana
        Judy Browning argued, Asst. Atty. General, Helena
        R. Bruce McGinnis argued, Dept. of Revenue, Helena,
        Montana
        Jack Yardley, Deputy County Attorney, Livingston,
        Montana

---

                Submitted:  July 8, 1986

                  Decided:  October 24, 1986

Filed: OCT 24 1986

_Ethel M. Harrison_
Clerk

Mr. Chief Justice J. A. Turnage delivered the Opinion of the Court.

On October 2, 1981, John and Cathryn Olson filed a complaint for declaratory judgment in the First Judicial District, in and for the County of Lewis and Clark. They alleged primarily that § 15-30-103, MCA, is unconstitutional as applied to them because the State of Montana has denied them equal protection of the laws. On January 6, 1984, the Olsons filed a motion for summary judgment. After extensive briefing and a hearing on the matter, the District Court entered its judgment granting plaintiffs' motion for partial summary judgment on the issue of voting rights and denying their motion on the issue of income taxation. The Olsons have appealed from both orders in the judgment. We affirm.

The Organic Act of the Territory of Montana, as enacted in 1864, defined part of the southern boundary as running due west on the 45th degree of latitude to a point formed by its intersection with the 34th degree of longitude west from Washington. 13 Stat. 85. By act of Congress, Yellowstone National Park (Yellowstone) was established in 1872. The northern boundary of Yellowstone was defined as the latitude of the junction of the Yellowstone and Gardiner Rivers, which is about three miles north of the 45th parallel. 16 U.S.C. § 21. Consequently, there is a strip of land in the northern part of Yellowstone, approximately three miles in width, that is within the State of Montana. These boundaries have remained unchanged to the present day.

Appellants live in that portion of Yellowstone which is north of the 45th parallel--specifically, between Gardiner, Montana, and the community of Mammoth Hot Springs. Although they reside within the boundaries of Montana, they do not

reside within the boundaries of any county. Because of their "county-less" status, appellants' right to vote was limited.

Section 13-1-111(1)(c), MCA, requires that, in order to vote in elections, a person must be a resident of the State of Montana and of the county in which he offers to vote for at least thirty days. Pursuant to this statute, the Clerk and Recorder of Park County, Montana, created a special register of electors for persons residing in that strip of Yellowstone between the 45th parallel and the northern boundary of the Park. This special register was for a ballot limited to elections for federal offices; therefore, appellants, and others similarly situated, could not vote in any state or local elections. However, persons living in this area were given an opportunity to become annexed to Park County by elections held November 7, 1978. Although the voters of Park County approved the proposed annexation, the residents of that part of Yellowstone which is in Montana unanimously rejected it. Thus, no annexation occurred.

Appellants are employed by TWA Services, Inc., a concessionnaire of the National Park Service at Mammoth Hot Springs, which is within the boundaries of the State of Wyoming. All of appellants' job duties are performed outside of Montana.

Beginning in 1975, the Department of Revenue (DOR) required appellants' employer to withhold from appellants' wages a certain amount of money for the state income tax, pursuant to §§ 15-30-103 and 15-30-202, MCA. Appellants filed timely returns claiming no income taxes were due the State because they resided on a federal area, and they applied for a refund of all taxes previously withheld. DOR granted a refund to appellants for the taxable years ending

3

December 31, 1974, and December 31, 1975. However, DOR subsequently reversed itself and demanded payment of the sums refunded. When appellants refused, DOR issued warrants for distraint for the return of the refunds. DOR has kept the amounts withheld from appellants' wages since the beginning of 1977 and has claimed that additional taxes are due. It began proceedings in September 1981 to garnish appellants' wages.

On October 2, 1981, appellants filed a complaint for declaratory judgment. In their complaint, appellants alleged that § 15-30-103, MCA, is unconstitutional as applied to them because the State is denying them equal protection of the laws. They based this assertion on the fact that they were not allowed to vote in state and local elections. Additionally, they claimed that § 13-1-111(1)(c), MCA, is unconstitutional as applied to them. Appellants requested the District Court to issue a restraining order prohibiting DOR from garnishing their wages and to order a stay of execution of any DOR judgments against them for back taxes. In the alternative, appellants asked the court to find that they are not subject to state income taxes or to find that they may vote in national, state and local elections.

On January 6, 1984, appellants moved for summary judgment. The court denied their motion as it related to the issue of the income tax but reserved judgment on the issue of voting rights until further briefing. Appellants subsequently moved the court to enter a partial summary judgment that § 13-1-111(1)(c) is unconstitutional as applied to them. In its response, the State agreed that appellants could not constitutionally be denied the right to vote in state and local elections. The District Court entered a final judgment

4

on August 23, 1985, granting appellants' motion for partial summary judgment on the issue of voting rights and denying their motion on the issue of income taxation.

Appellants raise three issues for review:

1. Whether the declaratory judgment of the District Court is responsive to the pleadings and issues raised regarding the constitutionality of the county residency requirement for voter registration and other benefits provided by county residency?

2. Whether the State of Montana has generally denied appellants equal protection of the laws?

3. Whether the legislature must take some formal action to accept retrocession of taxing jurisdiction by the federal government before an income tax can be lawfully assessed on appellants?

I

Appellants first contend that the District Court's judgment is not responsive to their motion for summary judgment because it did not specifically declare that § 13-1-111(1)(c) was unconstitutional. In its Opinion, Memorandum and Order the court stated:

> [P]laintiffs' Motion for Partial Summary Judgment is granted on this issue. The Court finds, declares and concludes that plaintiffs and plaintiff-intervenor, who are residents of that portion of Yellowstone National Park which is located within the exterior boundaries of the State of Montana, but not within any county of the state, must be permitted to vote in state and county elections . . . The franchise of state residents who have a substantial interest in the state's electoral decisions but do not live in a county should not be conditioned upon residency within a county for a period of thirty says [sic] as is required by Section

> 13-1-111(1)(c), MCA. The Park County
> Clerk and Recorder should, upon request,
> permit those plaintiffs . . . to regis-
> ter and vote in state and local
> elections.

Although the court did not specifically state that § 13-1-111(1)(c) is unconstitutional, the judgment had the same effect. Appellants' motion was granted, and there is no uncertainty that they can now register and vote in state and local elections.

We find no error in the court's judgment. In Evans v. Cornman (1970), 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370, the United States Supreme Court held that a state cannot constitutionally prohibit residents of a federal enclave located within that state from voting in state and local elections unless the state can demonstrate that those residents are not substantially interested in electoral decisions made within that state. In this case, the State has made no attempt to demonstrate the requisite lack of interest of appellants in electoral decisions; in fact, the State has agreed that appellants cannot constitutionally be prohibited from voting in state and local elections. Therefore, so that there is no doubt concerning appellants' right to fully participate in the electoral process, we hold that § 13-1-111(1)(c) is unconstitutional insofar as it acts to deny those who live in the Montana portion of Yellowstone from voting in state and local elections. Since the District Court's judgment achieved this same result, we find no reason to require the court to amend it.

Appellants also contend that the court's judgment was silent as to certain collateral issues which were raised below; for example, whether appellants and their neighbors are residents for hunting or fishing license purposes. For

6

the reasons set forth below, this contention need not be addressed.

## II

Appellants claim that the State has generally denied them equal protection of the laws because of their "county-less" status. They assert that because they do not reside in a county, they cannot run for county office, they cannot obtain a hunting or fishing license, and they do not have a county domicile for civil litigation venue purposes. Appellants contend that these statutes which require county residence before certain benefits can attach are unconstitutional as applied to them.

At the threshold of every case, especially those where a statutory or constitutional violation is claimed to have occurred, is the requirement that the plaintiff allege "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues . . ." Baker v. Carr (1962), 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678. This principle is generally referred to as standing to sue, and there are two distinct bases upon which standing rests. The first is the constitutional provision which extends original jurisdiction of the District Court to "cases at law and in equity." Art. VII, Sec. 4, 1972 Mont. Const. This provision has been interpreted as embodying the same limitations as are imposed by federal courts under the Article 3 "case or controversy" provision of the United States Constitution. See, Stewart v. Bd. of Cty. Com'rs of Big Horn Cty. (1977), 175 Mont. 197, 573 P.2d 184. The second base of the doctrine is one of judicial self-restraint imposed for reasons of policy.

7

At a minimum, the constitutional aspect of standing requires a plaintiff to show that he has personally been injured or threatened with immediate injury by the alleged constitutional or statutory violation. Before we can find a statute to be unconstitutional, "the party who assails it must show, not only that the statute is invalid, but that he has sustained, or is in immediate danger of sustaining some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." Chovanak v. Matthews (1948), 120 Mont. 520, 526, 188 P.2d 582, 585.

It may be true that appellants would not have been permitted to obtain a hunting or fishing license if they had sought one. However, we do not know this because appellants have not alleged that they asked for such a license and were denied. Nor have they alleged that they sought to run for a county office and were prohibited from doing so; they have not even alleged that they want to do either of these things. It is not enough that appellants allege an injury which others may have suffered by the operation of some statute. They must allege an injury personal to themselves as distinguished from one suffered by the community in general. As stated by the United States Supreme Court in Warth v. Seldin (1975), 422 U.S. 490, 502, 95 S.Ct. 2197, 2207, 45 L.Ed.2d 343, 357:

> Petitioners must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent. Unless these petitioners can thus demonstrate the requisite case or controversy between themselves personally and respondents, "none may seek relief on behalf of himself or any other member of the class."

Appellants have not alleged a personal injury that is a prerequisite to an adjudication on the merits. Appellants may have shown that certain statutes could cause an injury to some unidentified persons living in the Montana portion of Yellowstone. However, the injury-in-fact test "requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." Sierra Club v. Morton (1972), 405 U.S. 727, 734-735, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636, 643. See also State v. Parker (1973), 161 Mont. 394, 506 P.2d 850.

Appellants have not alleged a personal injury suffered by the operation of the statutes in question sufficient to meet the requirements of standing. Therefore, with the exception of their claim on the voting issue where a personal injury was shown, the alleged denial of equal protection will not be considered.

III

In 1889, when Montana became a state, it acquired sovereignty over all persons and property within its jurisdiction, except for those things within the exclusive jurisdiction of the federal government. One of the most basic aspects of a state's sovereignty is its inherent power to levy a tax on its citizens, for without this power, the state as an entity would cease functioning. This power is limited only by the supremacy of the federal government and the federal constitution. "All subjects over which the sovereign power of a State extends, are objects of taxation; but those over which it does not extend, are, upon the soundest principles, exempt from taxation." M'Culloch v. State of Maryland (1819), 4 Wheat 316, 429, 4 L.Ed. 579, 607. Therefore, where

9

the federal government exercises exclusive jurisdiction, the state has no power to tax persons and property under that jurisdiction.

In 1917 the legislature ceded exclusive jurisdiction over the Montana portion of Yellowstone National Park to the United States, reserving only the right to serve civil or criminal process. The State did not reserve the power to levy a tax upon any persons or property in that part of the Park. Thus, under Art. I, Sec. 8, Cl. 17 of the United States Constitution, the State subsequently had no power to tax any persons residing in that area of the Park. However, in 1940, Congress passed what is commonly called the Buck Act. That Act provides:

> No person shall be relieved from liability for any income tax levied by any State, or by any duly constituted taxing authority therein, having jurisdiction to levy such a tax, by reason of his residing within a Federal area or receiving income from transactions occurring or services performed in such area; and such State or taxing authority shall have full jurisdiction and power to levy and collect such tax in any Federal area within such State to the same extent and with the same effect as though such area was not a Federal area.

4 U.S.C. § 106(a).

The purpose of the Act was to remove the inequity that existed between individuals who resided on federal lands and paid no taxes and those who did not reside on federal lands. Prior to this Act, those persons living on federal areas were exempt from state income taxes but were able to enjoy the benefits offered by state citizenship. The Buck Act removed this inequity.

The District Court found that the State acquired the right to tax those persons living in the Montana portion of

Yellowstone by virtue of the Buck Act. Appellants contend that this is error. They assert that before the State can levy such a tax, the legislature must take some formal action to reclaim jurisdiction over that area; namely, amend the boundaries of Park County or amend § 2-1-207, MCA, which cedes exclusive jurisdiction over the area to the United States.

Initially, we find important the fact that the Buck Act itself does not require any formal action prior to the state's acquisition of taxing jurisdiction. Specifically, the Act states that the "State or taxing authority <u>shall</u> <u>have</u> <u>full</u> <u>jurisdiction</u> <u>and</u> <u>power</u> <u>to</u> <u>levy</u> <u>and</u> <u>collect</u> <u>such</u> <u>tax</u> . . . <u>to</u> <u>the</u> <u>same</u> <u>extent</u> <u>and</u> <u>with</u> <u>the</u> <u>same</u> <u>effect</u> <u>as</u> <u>though</u> <u>such</u> <u>area</u> <u>was</u> <u>not</u> <u>a</u> <u>Federal</u> <u>area</u>." [Emphasis added.] From a plain reading of the statute, Montana acquired jurisdiction to tax appellants by virtue of the Buck Act itself without the need for anything further to be done on the part of the legislature.

Appellants have not cited, and we have been unable to find, any cases requiring formal action by the state legislature before the state could levy a tax on residents of a federal area. Kiker v. City of Philadelphia (Pa. 1943), 31 A.2d 289, was the first major case to consider the effect of the Buck Act on a state's taxing jurisdiction over residents of a federal area. An ordinance of the City of Philadelphia imposed an income tax on work performed in that city. Kiker was a resident of the State of New Jersey and was employed at the League Island Navy Yard, which was originally a part of Philadelphia. League Island was purchased by the United States in 1827 from Philadelphia who ceded exclusive jurisdiction over the area to the federal government. The

11

Pennsylvania Supreme Court held that Kiker's income was subject to the city's income tax by virtue of the Buck Act even though he was a nonresident and was employed by the federal government. The court stated:

> Although plaintiff's salary was at that time immune from this levy [i.e., prior to the Buck Act], when the immunity was removed by Public Act No. 819 [the Buck Act], which receded to Philadelphia jurisdiction to impose taxes on League Island, the ordinance became applicable there without further action by either the State legislature or city council.
>
> . . .
>
> When the disability of the State to tax federal incomes was removed, there was no need for a reenactment of the legislation to reach incomes formerly exempt; the powers originally granted, broad enough to include all income regardless of the source, were sufficient for the purpose. [Emphasis added.]

Kiker, 31 A.2d at 297.

The Indiana Supreme Court had before it the same argument as is advanced by appellants in this case; i.e., the Buck Act is permissive only, and since the legislature had failed to take further positive steps to reclaim taxing jurisdiction over the federal area, the tax could not be levied. That court held:

> In our opinion any immunity which appellee herein may have enjoyed from the payment of Indiana Gross Income tax, on income received from construction contracts performed for the United States by and through its duly authorized agents, on lands either ceded to or purchased by the United States, . . . was revoked by the enactment of § 106 of the "Buck Act" and it was not necessary for the Indiana Legislature to take any positive action either to amend or repeal the Cession Act of 1883, as amended.
>
> The enactment and enforcement of the Gross Income tax law was sufficient to show an acceptance by the State of

12

> Indiana of the offer of Congress to permit the levying of such taxes as provided in the "Buck Act," if such were necessary.

State v. Pearson Construction Company (Ind. 1957), 141 N.E.2d 448, 453.

We, too, find appellants' argument unpersuasive. The power to tax is an inherent feature of state sovereignty. Montana had jurisdiction originally to tax persons living in the Montana portion of Yellowstone prior to its cession to the United States. After the cession, the only impediment to levying such a tax was the exercise of exclusive jurisdiction over the area by the federal government. Therefore, the application of an income tax to appellants and others similarly situated does not depend upon an act of the Montana legislature, but rather upon the will of Congress. By passing the Buck Act, Congress expressed its intention to remove the jurisdictional impediment to taxing residents and employees of federal areas that existed prior to the Act. Montana regained taxing jurisdiction over residents of federal areas by virtue of the Buck Act itself, and there was no need for any further action to be taken by the legislature. The State is free to levy a tax upon appellants' income "to the same extent and with the same effect" as if the Montana portion of Yellowstone were not a federal area.

However, appellants point to §§ 2-1-215 and 2-1-216, MCA, for their assertion that retrocession of jurisdiction is not effective until acceptance by the governor. Since the governor has not accepted retrocession of taxing jurisdiction over the area in question yet, the State has no jurisdiction to tax appellants. Section 2-1-216, MCA, provides:

> (2) After acceptance and approval by the governor, retrocession of jurisdic-

13

> tion becomes effective upon filing of
> the original acceptance with the secre-
> tary of state of Montana.

Read literally, this statute does seem to require acceptance by the governor prior to any retrocession of jurisdiction by the federal government. The legislative history of this statute indicates that the legislature probably did not intend to require acceptance by the governor prior to every retrocession. We need not decide this issue, however, because there is a fatal flaw in appellants' argument.

Sections 2-1-215 and 2-1-216 were enacted in 1979, and there was no similar statute prior to that time. The Buck Act was passed in 1940. Consequently, the State acquired taxing jurisdiction over the Montana portion of Yellowstone in 1940 through the Buck Act. Although it is said that acceptance by the State is technically necessary to render a retrocession of jurisdiction effective, it is universally held that acceptance is presumed, especially where state taxation of the federal area is involved. S.R.A., Inc. v. Minnesota (1946), 327 U.S. 558, 66 S.Ct. 749, 90 L.Ed. 851; Burns v. State, Bureau of Revenue, Income Tax Div. (N.M. 1968), 439 P.2d 702; Kiker, supra. We find nothing by the legislature indicating that retrocession of taxing jurisdiction was not accepted. Thus, Montana acquired taxing jurisdiction over the Park strip long before §§ 2-1-215 and 2-1-216 were passed. In the absence of an express intent to the contrary by the legislature, statutes are presumed to operate prospectively only. Penrod v. Hoskinson, M.D. (1976), 170 Mont. 277, 552 P.2d 325. There is nothing in those statutes indicating an intent by the legislature to deprive the State of taxing jurisdiction in the absence of formal acceptance. We will not apply them retroactively to

14

deprive the State of jurisdiction it had acquired almost forty years earlier.

Appellants further contend that the State must cure its denial of equal protection of the laws, vis-a-vis the residents of the Park strip, before it can constitutionally levy an income tax on those residents. Specifically, they assert that before the income tax can be levied, the State must confer upon them all of the benefits of state citizenship now enjoyed by those who reside within a county. This is a novel argument indeed. To begin with, we have already determined that appellants do not have standing to raise their claims of denial of equal protection. However, even if we assume that appellants do not now enjoy all the benefits which derive from county residence, their argument still fails.

It is beyond question that the State has the right to tax the incomes of nonresidents earned within this state. That principle was established over fifty years ago by the United States Supreme Court in Shaffer v. Carter (1920), 252 U.S. 37, 40 S.Ct. 221, 64 L.Ed. 445. Yet, it is obvious that nonresidents do not share in all of the benefits conferred by residency within this state. Thus, by simple force of logic, appellants' simplistic argument that the State cannot levy a tax upon their incomes until it also bestows upon them every benefit enjoyed by those who reside within a county cannot be accepted.

This same argument, although under slightly different facts, was raised in American Commuters Association v. Levitt (2nd Cir. 1969), 405 F.2d 1148. There, plaintiffs were nonresidents of New York and were subjected to New York income tax for work performed in that state. They sought a declaratory judgment holding unconstitutional various New

York statutes which afford benefits to New York residents because those statutes discriminate against nonresidents. Plaintiffs argued that they could not take advantage of the benefits offered by residency in New York but were subjected to identical tax burden. The court rejected this argument, noting that New York residents are subjected to sales and property taxes in addition to the income tax, so there was not identical taxation between residents and nonresidents. In addition, plaintiffs did receive some benefits by reason of their working in New York, such as police and fire protection.

In a case such as this one, where a tax is alleged to be unconstitutional because the claimants, whether they are residents or nonresidents, do not enjoy the same benefits as others who reside within this State, the controlling test in determining the constitutionality of the tax is "whether the state has given anything for which it can ask return." Wisconsin v. J. C. Penney Co. (1940), 311 U.S. 435, 444, 61 S.Ct. 246, 250, 85 L.Ed. 267, 270-271. As residents of Montana, appellants enjoy substantial benefits. They are able to freely use the State's roads, enjoy the State's parks, have access to the State's courts, and have the right to run for state office. Since 1984 they have had the right to vote in state and local elections. Although the National Park Service now provides appellants with road maintenance and law enforcement within the Park, the State is obligated to supply those services to appellants. Should the Park Service ever decide to cease performing those services, road maintenance and police and fire protection would be provided by the State. Furthermore, appellants do not have an identical tax burden with county residents since they are not subject to

any taxes imposed by reason of county residency. Therefore, we hold that the tax levied on appellants' income is constitutional and does not deprive them of equal protection of the laws. The denial of certain benefits, as alleged by appellants, is not a sufficient reason to prevent the State from levying an income tax upon them. Were it otherwise, every time an equal protection claim were sustained before this Court or before a federal court, the State would be obligated to return all income taxes withheld during the period the particular benefit was being denied.

Affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____

_____

_____
Justices

17