No. 01-385

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 109

M. JEFF HAGENER, Director, MONTANA
DEPARTMENT OF FISH, WILDLIFE AND PARKS,

Plaintiff/Respondent,

v.

LEN WALLACE and PAMELA WALLACE
d/b/a BIG VELVET RANCH,

Defendants/Appellants.

APPEAL FROM:  District Court of the First Judicial District,
In and for the County of Lewis & Clark,
The Honorable Dorothy McCarter, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Stanley T. Kaleczyc, Kimberly A. Beatty, Browning, Kaleczyc, Berry &
Hoven, P.C., Helena, Montana

Arthur Wittich (argued), Attorney at Law, Bozeman, Montana

For Respondent:

Robert N. Lane (argued), John F. Lynch, Agency Counsel and Special
Assistant Attorney General, Helena, Montana

For Amicus:

Jack R. Tuholske (argued), Attorney at Law, Missoula, Montana

Argued and Submitted: January 8, 2002
Decided: May 23, 2002

Filed:

_____
Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1 The Plaintiff, M. Jeff Hagener, Director of the Montana Department of Fish, Wildlife and Parks (FWP), brought this action on behalf of FWP in the District Court for the First Judicial District in Lewis & Clark County, initially seeking a temporary restraining order prohibiting the Defendants, Len and Pamela Wallace, from causing or allowing the transfer of approximately 500 game farm elk from their game farm in Ravalli County to the Crow Indian Reservation for release into the wild. The District Court granted the temporary restraining order. Following a show cause hearing to consider why a permanent injunction should not be entered, the District Court permanently enjoined the Wallaces from transferring their game farm elk to the Crow Indian Reservation. The Wallaces appeal the order of the District Court. We affirm the District Court's injunction.

¶2 The following issues are presented on appeal:

¶3 1. Did the District Court err when it permanently enjoined the Wallaces from causing or allowing their game farm elk to be transported to the Crow Indian Reservation for release into the wild?

¶4 2. Did the District Court erroneously extend FWP's jurisdiction to activities within the exterior boundaries of the Crow Indian Reservation?

¶5 3. Did the District Court's permanent injunction violate the Commerce Clause of the United States Constitution?

2

## FACTUAL AND PROCEDURAL BACKGROUND

¶6 Len and Pamela Wallace own and operate the Big Velvet Ranch, a licensed alternative game farm located in Ravalli County, Montana. After Montanans approved Initiative 143 through the citizen initiative process in November 2000 to prohibit shooting alternative livestock for a fee or other remuneration and prohibit the transfer of existing livestock licenses, Len Wallace sought to reduce the size of his herd by donating approximately 500 head of elk to the Crow Indian Tribe. The Tribe, whose reservation is surrounded on three sides by the State of Montana in southcentral Montana, accepted his offer. Wallace then asked FWP by telephone what conditions FWP would agree to for the transfer of the elk to the Tribe for release into the wild. In a letter dated April 30, 2001, FWP's director, Jeff Hagener, responded to Wallace's inquiry. Hagener concluded that such a transfer would violate Montana law, specifically § 87-4-414(6), MCA, and § 87-5-711, MCA, stating "[b]oth of these statutes are intended by the legislature to protect native wildlife populations from genetic pollution, feral populations and disease transmissions which could occur if alternative livestock are released into the wild."

¶7 The Wallaces responded to FWP's letter on May 1, 2001. The Wallaces did not directly address Hagener's comments but derided FWP for what the Wallaces deemed to be FWP's bias against game farms. Furthermore, the Wallaces claimed that their elk were genetically superior to Montana's native elk because Big Velvet elk "bugle, have some real antlers, and are not as spooky" as native elk.

3

¶8 On the morning of May 2, 2001, despite FWP's letter, the Wallaces allowed the shipment of sixty-eight elk from their facility in Darby, Montana, to the Crow Indian Reservation. The truckload of elk had been inspected by representatives from the Department of Livestock (DOL) and were certified as healthy for shipment. As is customary in livestock transactions, the parties executed a bill of sale and the Tribe took title of the elk at the Wallaces' facility. The Crow Tribe arranged for and paid for all transportation costs to the Reservation. The Tribe did not have a game-proof fence in place around the exterior boundary of the Reservation. The sixty-eight elk were released into the wild.

¶9 When FWP heard of the transfer at about noon that day, it immediately sought and obtained an *ex parte* temporary restraining order from the First Judicial District Court, Lewis and Clark County, prohibiting the Wallaces from causing or allowing their elk to be transported to the Crow Indian Reservation. On May 3, 2001, the Wallaces moved to dissolve the temporary restraining order. The District Court denied the Wallaces' request on May 7, 2001. On May 9, 2001, the District Court held a show cause hearing to consider why the Wallaces should not be permanently enjoined. On May 10, 2001, the District Court permanently enjoined the Wallaces from "transferring their game farm elk to the Crow Indian Reservation." The Wallaces appealed the District Court's order on May 14, 2001.

¶10 At the time FWP obtained the temporary restraining order, the Big Velvet herd had been certified by a state veterinarian as a tuberculosis-accredited herd, meaning that the herd had been tuberculosis-free based on three consecutive years of testing all animals twelve months or older. The Big Velvet herd was also in the process of being certified as

4

brucellosis-free since all test-eligible animals had tested brucellosis-free for three consecutive years. The veterinarian determined that the herd was free of elk-red deer hybridization and, based on the large number of Big Velvet elk tested, opined that chronic wasting disease (CWD) did not exist in the herd. Therefore, because the veterinarian determined that the Big Velvet herd was tuberculosis-free, brucellosis-free, CWD-free and genetically pure, he concluded that the herd posed no realistic threat to Montana's livestock, native deer and elk populations, or human health.

¶11 The Crow Tribe has not participated in these legal proceedings and has not asked to intervene or file an amicus brief addressing the legal issues presented in this case. According to a letter sent from an attorney representing the Crow Tribe to the District Court, dated May 8, 2001, the authenticity of which was acknowledged at oral argument, "[i]n the Tribe's opinion, this is a matter regarding the assertion of State law over a citizen of the State of Montana, not the assertion of Montana law on the Reservation. As a consequence, the Tribe has little interest in this case at this time."

## STANDARD OF REVIEW

¶12 Typically, we review a district court's grant or denial of an injunction to determine if the court abused its discretion. *See Jarrett v. Valley Park, Inc.* (1996), 277 Mont. 333, 346, 922 P.2d 485, 493; *Butler v. Germann* (1991), 251 Mont. 107, 114, 822 P.2d 1067, 1072; *Sampson v. Grooms* (1988), 230 Mont. 190, 194, 748 P.2d 960, 963. However, where, as here, the district court bases its decision to grant such relief upon its interpretation of a statute, no discretion is involved and we review the district court's conclusion of law to

5

determine whether it is correct. *M.H. v. Montana High School Ass'n* (1996), 280 Mont. 123, 130, 929 P.2d 239, 243.

¶13 Resolution of this case also involves interpretation or application of the Commerce Clause of the United States Constitution. We likewise review constitutional interpretations for correctness. *Henry v. State Compensation Ins. Fund*, 1999 MT 126, ¶ 10, 294 Mont. 448, ¶ 10, 982 P.2d 456, ¶ 10 (*citing State v. Butler*, 1999 MT 70, ¶ 7, 294 Mont. 17, ¶ 7, 977 P.2d 1000, ¶ 7).

DISCUSSION

ISSUE 1

¶14 Did the District Court err when it permanently enjoined the Wallaces from causing or allowing their game farm elk to be transported to the Crow Indian Reservation for release into the wild?

¶15 The Wallaces contend that the District Court erred when it issued a permanent injunction prohibiting them from transferring their elk to the Crow Tribe because the party seeking the injunction, FWP, lacked jurisdiction over the inspection, transportation, and health of the alternative livestock they owned. The Wallaces assert that pursuant to Montana's statutory scheme regulating game farm licensees, DOL, not FWP, had authority and primary jurisdiction over the transfer. In this case, DOL inspected the herd for brucellosis, tuberculosis, elk-red deer hybridization, and CWD, and granted a permit allowing transport of the elk to the Crow Indian Reservation. Therefore, the Wallaces contend that the transfer should have been allowed. Alternatively, the Wallaces argue that

6

even if FWP had authority over the transfer, it could not demonstrate that harm would result from the transfer given DOL's conclusion that the Big Velvet herd posed no realistic threat to Montana's livestock, native deer and elk populations, or human health.

¶16 In response, FWP asserts that the Wallaces violated various statutory requirements for game farm licensees which were its responsibility to enforce, whether or not they satisfied DOL's requirements. For example, FWP contends that it has the duty to protect native wildlife populations, enforce the fencing of game farms, and prevent the release of game farm elk into the wild. FWP contends that upon transfer of the Big Velvet herd to the Tribe, the elk would not have been confined behind a game-proof fence, would not have been transferred to another licensed alternative livestock ranch, and, as a result, could migrate back into Montana from the Crow Indian Reservation. Therefore, FWP contends that it had a duty to act and the District Court did not err when it granted the permanent injunction.

¶17 The District Court agreed with FWP on the sole basis that the Wallaces' actions violated § 87-4-414(6), MCA. Section 87-4-414(6), MCA, provides in part that alternative livestock may only be kept on a licensed alternative livestock ranch. Because the Crow Tribe was not a licensed alternative livestock facility under Montana law at the time of the transfer, the District Court concluded that neither FWP nor DOL had the authority to permit the transfer of the Big Velvet herd to the Crow Tribe. We conclude that the District Court arrived at the correct result for the following reasons.

¶18 Section 87-4-408, MCA, generally delineates the respective responsibilities of FWP and DOL in the game farm context, and provides:

7

**Jurisdiction.** (1) The department [FWP] has primary jurisdiction over alternative livestock ranches with regard to licensing, reports, recordkeeping, *exterior fencing*, classification of certain species under 87-4-424, unlawful capture under 87-4-418, inspection under 87-4-413, and enforcement of the functions listed in this subsection.

(2) The department of livestock has primary jurisdiction over alternative livestock ranches with regard to marking, inspection, transportation, importation, quarantine, hold orders, interior facilities, health, and enforcement of the functions listed in this subsection. [Emphasis added.]

The jurisdictional boundaries set forth in § 87-4-408, MCA, generally correspond to the underlying function of each department. FWP, as provided in § 87-1-201(2), MCA, has a duty to "enforce all the laws of the state respecting the protection, preservation, and propagation of fish, game, fur-bearing animals, and game and nongame birds within the state." *See also Matter of Brogan* (1997), 283 Mont. 413, 420, 942 P.2d 100, 105 (stating that the preservation of Montana's wildlife resources is a duty entrusted to FWP through its regulation of the game farm industry). In contrast, DOL's primary function is to "protect the livestock interests of the state" from disease and to promote and foster a heathy livestock industry. *See generally* § 81-1-102(1), MCA. In the game farm context, DOL plays a critical role in the health, certification, and inspection of livestock. When disease is detected or suspected, DOL has the authority to either quarantine or monitor the diseased herd in order to protect other state livestock. While FWP is generally responsible for protecting Montana's native wildlife resources, DOL is primarily responsible for ensuring the health of domestic livestock.

¶19 Given the Wallaces' undisputed knowledge that the Big Velvet herd would be released into the wild on the Crow Indian Reservation and FWP's reasonable deduction that those elk

8

may migrate back into Montana, we hold that FWP had concurrent jurisdiction to seek the permanent injunction granted in this case. Generally, FWP is entrusted with the duty of protecting Montana's native wildlife populations. To that end, FWP must ensure that captive alternative livestock and native wildlife populations are kept separate, in order to protect native populations from the introduction of feral populations, genetic pollution, competition for forage or habitat, and the spread of disease.

¶20 That underlying duty of FWP is illustrated by specific assignments of responsibility applicable to this case. To ensure alternative livestock confinement, FWP has the duty to enforce "exterior fencing," and a supplemental duty to enforce fencing requirements. § 87-4-408(1), MCA. While DOL regulates internal game farm operations and facilities, the Legislature designated FWP as the appropriate state agency to ensure that alternative livestock are kept separate from native wildlife populations. Pursuant to that designation and to its rulemaking authority provided in § 87-4-422(1), MCA, FWP has promulgated game-proof fencing requirements to protect against intermingling. *See* Rules 12.6.1531 through -1536, ARM. Based on FWP's jurisdiction over exterior fencing and FWP's knowledge that the Big Velvet herd would not be contained behind a game-proof fence upon delivery to the Crow Tribe, FWP had the jurisdictional authority to seek the permanent injunction to prevent the transfer.

¶21 The Wallaces note that the principle statute enumerating fencing and enclosure requirements, § 87-4-426, MCA (1999), was repealed by I-143. However, that statute was repealed because the fencing and enclosure requirements set forth in that section were to be

9

considered in determining whether a new alternative livestock license should be issued, and I-143 prohibited the issuance of any new alternative livestock licenses. Therefore, there was no further need for § 87-4-426, MCA (1999). For those who were licensed under the former law, however, the fencing requirements were a condition to the issuance of their license and are as binding today as they were when the license was issued.

¶22 The second specific statutory basis for FWP's authority to act is its authority over all matters dealing with the importation, introduction and transplantation of wildlife. Section 87-5-711(1), MCA, provides:

> **Control of importation for introduction and transplantation or introduction of wildlife.** (1) Except as otherwise provided, the importation for introduction or the transplantation or introduction of any wildlife is prohibited unless the commission [FWP] determines, based upon scientific investigation and after public hearing, that a species of wildlife poses no threat of harm to native wildlife and plants or to agricultural production and that the transplantation or introduction of a species has significant public benefits.

We interpret § 87-5-711(1), MCA, to mean that the introduction or transplantation of *any* wildlife, including game farm elk, into the wild requires FWP approval. The purpose behind that requirement was made explicitly clear by the Legislature in § 87-5-701, MCA:

> The legislature finds that in order to protect the native wildlife [of Montana] . . . it is necessary to provide for the control of the importation for introduction and the transplantation or introduction of wildlife in the state. Serious threats, known and unknown, to the well-being of native wildlife . . . resulting from the introduction of wildlife into natural habitats, necessitate the prohibition of the importation for introduction and the transplantation or introduction of wildlife into natural habitats unless it can be shown that no harm will result from such transplantation or introduction.

10

¶23 The statutes cited above underscore the Legislature's resolve to protect the "well-being of native wildlife." When native wildlife are threatened by the transplantation or introduction of wildlife, FWP has authority to act. That is what happened in this case.

¶24 The Wallaces respond that the Big Velvet herd was tested and determined to be tuberculosis-free, brucellosis-free, CWD-free, and genetically pure by a state veterinarian. Therefore, their argument follows that the herd posed no realistic threat to Montana's livestock, native deer and elk populations, or human health. We disagree for several reasons.

¶25 First, at present, there is no test for CWD in live animals.[1] Infected animals can only be conclusively tested for CWD after death. Such limitations on the testing for CWD were recently recognized by the Legislature. In May of 2000, prior to the passage of I-143, the Legislature imposed a moratorium on applications for new alternative livestock ranches until a test for CWD in living animals was developed and approved by DOL. *See* May 2000 Spec. Sess. L., Ch. 1 (Senate Bill 7). Passage of S.B. 7 was in part a response to the diagnosis of CWD at a Philipsburg game farm in October of 1999,[2] and the permanent, irreversible nature

---

[1] CWD is a fatal disease of the central nervous system of captive and free-ranging mule deer, white-tailed deer, and Rocky Mountain elk. Montana Fish, Wildlife and Parks, *What is Chronic Wasting Disease?* (visited May 2, 2002) <http://www.fwp.state.mt.us/hunting/cwd.asp#CWDQ1>.

[2] The entire mule deer herd at the Philipsburg game farm ranch was destroyed in December of 1999. Mark Henckel, *Deer-Kill at Game Farm Completed and Carcasses on Way to Lab* (visited May 2, 2002) <http://www.billingsgazette.com/region/20000128_reg03.html>.

11

of the disease. To date, CWD has not been diagnosed in any of Montana's free-ranging cervid populations.

¶26 In this case, although 196 animals were tested in 1999 and 160 animals were tested in 2000, such tests are not conclusive that CWD does not exist within the Big Velvet herd. Furthermore, the record indicates that at least two Big Velvet elk recently died and that testing for CWD was not done following their deaths, as is customary. Taken together, these factors further limit DOL's ability to conclusively certify that the Big Velvet herd was CWD-free.

¶27 Second, the Wallaces claim that their elk are genetically pure based presumably on the elk-red deer hybridization test. However, the test for elk-red deer hybridization only assays for two phenotypic markers expressed through a red deer's genetic background, one for hemoglobin and one for transferrin. These two markers are but two genes out of a larger genetic makeup of an individual animal. Therefore, the elk-red deer hybridization test cannot indicate genetic purity in elk.

¶28 Finally, the Wallaces themselves bragged about the genetic superiority of their elk in comparison to Montana's native elk. According to the Wallaces, Montana's "wild" herd has been transformed into a "spooky, small antlered, non-bugling elk." Regardless of the merits of the Wallaces' contentions and without determining what desirable elk qualities are, such distinctions serve to underscore that there may be differences between captive elk and native elk, and the need for FWP to be diligent to protect the integrity of native populations. Therefore, we conclude that FWP properly asserted jurisdiction in this case.

12

¶29 Given FWP's jurisdiction, we must now determine whether the Wallaces violated any statutory duties imposed upon them as licensed game farm ranchers. We hold that while the Wallaces did comply with certain statutory obligations, they ignored others, and in the process violated Montana law. As a licensee, the Wallaces had a duty to dispose of their livestock in a manner which complied with the requirements of Title 87, Chapter 4, Part 4, MCA. Section § 87-4-414(2), MCA, provides that a licensee:

> [M]ay acquire, breed, grow, keep, pursue, handle, harvest, use, sell, or *dispose of alternative livestock and their progeny in any quantity and at any time of year as long as the licensee complies with the requirements of this part*, except that the licensee may not allow the shooting of game animals or alternative livestock, as defined in 87-2-101 or 87-4-406, or of any exotic big game species for a fee or other remuneration on an alternative livestock facility. [Emphasis added.]

Therefore, the Wallaces had an express obligation to comply with each and every requirement under the statutory scheme regulating game farms.

¶30 The District Court based its decision to grant the permanent injunction on § 87-4-414(6), MCA. Specifically, § 87-4-414(6), MCA, provides in pertinent part:

> Alternative livestock must be lawfully acquired by the licensee. *Alternative livestock may be kept only on a licensed alternative livestock ranch.* A licensee who keeps alternative livestock owned by, leased to, or leased from another person shall comply with all of the requirements of this part as if the animal belonged to the licensee. [Emphasis added.]

In this case, the Wallaces attempted to dispose of their alternative livestock to the Crow Indian Reservation, a destination they knew was not a licensed alternative livestock ranch. The Crow Tribe, in turn, intended to release the Big Velvet herd into the wild. Prior to the transfer, the Wallaces contacted FWP and asked under what conditions FWP would approve

13

the transfer. Despite FWP's warning that the transfer would violate § 87-4-414(6), MCA, the Wallaces proceeded to ship the elk to the Reservation. With knowledge that the elk were destined for a location other than a licensed alternative ranch and for ultimate release into the wild, the District Court correctly concluded that the Wallaces violated their duty as licensees to act in accordance with the requirement of § 87-4-414(6), MCA.

¶31  The Wallaces' attempt to transfer their elk to a location without an appropriate game-proof fence also violated Montana law. *See* Rules 12.6.1531 through -1536, ARM. Not only was the destination unapproved, but the intent behind the destination was to release them into the wild. Because the Crow Tribe is bordered on three sides by the State of Montana, a distinct possibility existed that those elk would naturally migrate back into the State of Montana. Because the Wallaces knew that the Big Velvet herd would not be confined behind a game-proof fence, the Wallaces disposed of their elk in violation of the duty imposed on them by § 87-4-414(2), to abide by all applicable licensee regulations.

¶32  Finally, the Wallaces attempted to participate in a transaction whereby their elk herd would be released into the wild without FWP approval, in contravention of § 87-5-711, MCA. Before transplantation of wildlife into the wild is lawful, FWP must approve the introduction based on a determination that the species poses no threat of harm to native wildlife or has significant public benefits. The Wallaces failed to obtain FWP approval for transplantation. In fact, the Wallaces completely ignored FWP's response to their inquiry. Therefore, the Wallaces violated statutory law.

14

¶33 The statutes at issue in this case are not mere technicalities or unreasonable obstacles to private enterprise. They are essential to ensure the health and safety of Montana's natural wildlife population. They reflect the theory underlying environmental protection that being proactive rather than reactive is necessary to ensure that future generations enjoy both a healthy environment and the wildlife it supports. *See generally MEIC v. Dept. of Environmental Quality*, 1999 MT 248, ¶ 77, 296 Mont. 207, ¶ 77, 988 P.2d 1236, ¶ 77.

¶34 FWP had a statutory basis for jurisdiction over the Wallaces as licensees, and the Wallaces failed to comply with statutory limitations pertaining to the disposal of their game farm elk. For these reasons, we conclude that the District Court correctly enjoined the Wallaces from causing or allowing their alternative livestock herd to be transported to a location where they would be released into the wild and could migrate back into Montana.

ISSUE 2

¶35 Did the District Court erroneously extend FWP's jurisdiction to activities within the exterior boundaries of the Crow Indian Reservation?

¶36 The Wallaces contend that the District Court erred when it effectively extended FWP's jurisdiction over alternative livestock onto tribal land, in violation of federal law. According to the Wallaces, the decision of the Crow Tribe to accept the Big Velvet elk herd was clearly an exercise of tribal self-government and FWP had no jurisdiction to interfere.

¶37 FWP contends its efforts were not an attempt to exercise jurisdiction over the Crow Tribe, but an attempt to prohibit the Wallaces, as licensed and regulated alternative livestock ranchers, from transferring their elk in violation of Montana law. Furthermore, FWP

15

contends that the permanent injunction issued by the District Court pertains to non-Indians outside the exterior borders of the Crow Indian Reservation and that, therefore, tribal sovereignty is not implicated.

¶38 Throughout these proceedings, the two parties have been the Wallaces and FWP. Given the Wallaces' claim that FWP's actions threaten the sovereignty of the Crow Tribe, it is worth noting that the Tribes have elected not to intervene or file an amicus brief in this case. In the past, tribal governments have appropriately asserted their rights to tribal sovereignty when at issue. In fact, the Crow Tribe stated to the District Court that this was "a matter regarding the assertion of State law over a citizen of the State of Montana, not the assertion of Montana law on the Reservation."

¶39 We conclude, based on our holding in *Northern Border Pipeline Co. v. Montana* (1989), 237 Mont. 117, 772 P.2d 829, that the Wallaces lack standing to assert that the District Court's permanent injunction violates the sovereignty of the Crow Tribe. In *Northern Border*, a pipeline company sought injunctive relief to prevent the State from assessing, levying, or collecting property taxes on that portion of a pipeline running beneath the Fort Peck Reservation trust lands. One of its claims was that the State's tax interferes to an impermissible extent with the Tribe's sovereign rights of self-government.

¶40 In that case, we reiterated that one of the bases for the standing requirement is "judicial self-restraint imposed for reasons of policy." *Northern Border*, 237 Mont. at 128, 772 P.2d at 835 (*citing Olson v. Department of Revenue* (1986), 223 Mont. 464, 470, 726 P.2d 1162, 1166). The policy of which we spoke in *Northern Border* was the "general

16

reluctance of courts to determine the rights of persons who are not parties to the suit . . . ." *Northern Border*, 237 Mont. at 128, 772 P.2d at 835; *see also Duke Power Co. v. Carolina Envtl. Study Group, Inc.* (1978), 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595, 616 (stating "the avoidance of the adjudication of rights which those not before the Court may not wish to assert, and the assurance that the most effective advocate of the rights at issue is present to champion them."). In *Northern Border*, we held:

> Northern Border has standing by virtue of its taxpayer status to challenge the property tax imposed on it by the State. However, it does not have standing to assert the Tribes' sovereign right of self-government in doing so. As we noted in *Olson*, the principle of standing requires that the plaintiff allege "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues . . . ." [Citation omitted.] Northern Border cannot allege a sufficient "personal" stake in the self-government interests of the Tribes to gain standing on this claim.

237 Mont. at 128-29, 772 P.2d at 836.

¶41 Without being members of the Crow Tribe, the Wallaces have insufficient "personal" stake in defending the self-government interests of the Crow Tribe. If FWP's actions in this case interfered with the sovereign rights of the Crow Tribe, then the Crow Tribe would be the "most effective advocate of the rights at issue" as contemplated in *Duke Power*. However, for reasons made clear to the District Court, the Crow Tribe opted not to intervene. Without adequately demonstrating a sufficient "personal" stake in defending the self-government interests of the Crow Tribe, we conclude that the Wallaces lacked standing to assert such a claim.

17

ISSUE 3

¶42 Did the District Court's permanent injunction violate the Commerce Clause of the United States Constitution?

¶43 Finally, the Wallaces contend that the permanent injunction issued by the District Court violates the Commerce Clause found at Article 1, Section 8, Clause 3, of the United States Constitution. Specifically, the Wallaces assert that the District Court's conclusion that the "Defendants may not transfer their game farm elk to a recipient that is not licensed in accordance with Title 87, Chapter 4, Part 4, MCA" results in extraterritorial application of Montana's regulatory scheme to foreign nations, other states, and Indian nations. Based on the District Court's order, the Wallaces assert that they would be prohibited from transferring their game farm elk to *any* recipient not licensed by Montana, including interested recipients in foreign countries, other states, and other tribal nations. Such a restriction, the Wallaces contend, is a regulation on commerce that directly conflicts with the Commerce Clause.

¶44 FWP contends that the issue in this case is whether the State of Montana can restrict transportation of alternative livestock to a location outside its jurisdiction in situations where, when released, a realistic possibility exists that they could migrate back into Montana. FWP concedes that a literal interpretation of the Court's language requiring licensing under Montana's statutory scheme, even for recipients in extraterritorial jurisdictions, is probably beyond the power or authority of the State. However, based on the facts and circumstances of this case, FWP argues that the permanent injunction does not violate the Commerce Clause because (1) there is no act of Congress which preempts the District Court's injunction

18

and (2) Montana's statutory framework is applied even-handedly and accomplishes a legitimate local public interest while only having incidental effects on interstate commerce.

¶45 The Commerce Clause provides that "[t]he Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[.]" U.S. Const. art. I. § 8, cl. 3.

¶46 To begin, the Wallaces' claim that the District Court's language in the permanent injunction is overbroad and violates all three subsections of the Commerce Clause, i.e., the Foreign Commerce Clause, the Interstate Commerce Clause, and the Indian Commerce Clause, is misplaced. The issue in this case is not whether the Wallaces can transfer their elk to a non-licensed recipient in another state or another country. The issue before this Court is whether the State of Montana can prevent a licensed Montana game farm operator from transferring alternative livestock to a tribal reservation within the exterior boundaries of the State of Montana when the tribe has expressed the intent to release those elk into the wild where they could naturally migrate back into Montana. It is within that context that we must examine the Wallaces' Commerce Clause claim.

¶47 In doing so, we conclude that this case falls squarely within a recognized exception to the traditional Commerce Clause analysis. Statutes regulating game farms found in Title 87, Chapter 4, Part 4, MCA, serve to isolate alternative livestock from native wildlife populations and domestic livestock. By confining alternative livestock in an enclosed area, the Montana Legislature sought to reduce the risk of spreading CWD, genetic pollution, interbreeding between wild and game-farm bred elk, and the establishment of feral

19

populations. Based on that premise, game farm regulations serve as quarantine laws. The United States Supreme Court has repeatedly upheld quarantine laws against Commerce Clause challenges.

¶48    As early as 1888, the Court in *Bowman v. Chicago & N.W. Ry. Co.* (1888), 125 U.S. 465, 489, 8 S.Ct. 689, 700, 31 L.Ed. 700, recognized that "states have [the] power to provide by law suitable measures to prevent the introduction into the states of articles of trade which, on the account of their existing condition, would bring in and spread disease, pestilence, and death . . . ." The quarantine exception recognizes that states may have a local interest in protecting public safety as a competing value when reviewing state burdens on interstate commerce. That interest extends to regulations on diseased or potentially diseased livestock. *See Asbell v. Kansas* (1908), 209 U.S. 251, 28 S.Ct. 485, 52 L.Ed 778; *Reid v. Colorado* (1902), 187 U.S. 137, 23 S.Ct. 92, 47 L.Ed 108. In *Guy v. Baltimore* (1879), 100 U.S. 434, 443, 25 L.Ed 743, the Court stated that:

> In the exercise of its police powers, a State may exclude from its territory, or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to the health or which would endanger the lives or property of its people.

¶49    Paramount in determining whether the state regulation in question qualifies under the quarantine exception is the true intent behind the regulation. *See Oregon-Washington R. & Nav. Co. v. Washington* (1926), 270 U.S. 87, 95, 46 S.Ct. 279, 281, 70 L.Ed. 482 (stating that quarantine laws "cannot . . . be made the cover for discriminations and arbitrary enactments having no reasonable relation to health; . . . ."); *Smith v. St. Louis & S.W. Ry. Co.* (1901), 181

20

U.S. 248, 257, 21 S.Ct. 603, 606, 45 L.Ed. 847 (noting that a law regulating commerce "under the guise" of a quarantine will not be permitted and that "[a]ny pretense or masquerade will be disregarded, and the true purpose of the statute ascertained."). Quarantine laws upheld by the U.S. Supreme Court have "not discriminate[d] against interstate commerce as such, but simply prevented traffic in noxious articles, whatever their origin." *City of Philadelphia v. New Jersey* (1978), 437 U.S. 617, 629, 98 S.Ct. 2531, 2538, 57 L.Ed.2d 475. Despite the fact that a majority of the Court's jurisprudence on the quarantine exception was developed at the turn of the century, the Court continues to consider the applicability of the quarantine exception to Commerce Clause challenges today. *See generally Chemical Waste Management, Inc. v. Hunt* (1992), 504 U.S. 334, 346-47, 112 S.Ct. 2009, 2016, 119 L.Ed 2d 121.

¶50 In this case, the requirement in § 87-4-414(6), MCA, that alternative livestock be kept only on licensed alternative livestock ranches is illustrative of the Legislature's recognition that unconfined alternative livestock intermingling with native wildlife populations may be prejudicial to both the health and property of Montanans. With the alarming spread of serious wildlife diseases throughout the country and particularly in the West, the State has a compelling interest to enact regulations to ensure that alternative livestock cannot simply roam into Montana and threaten native populations. One of those regulations is § 87-4-414(6), MCA.

¶51 Moreover, statutes which regulate the game farm industry like § 87-4-414(6), MCA, are not economic protectionist measures. In fact, neither FWP nor DOL have the authority

21

to act in those cases when in-state licensees transfer alternative livestock to recipients in other states, other countries, or other tribal nations, if there is no realistic threat that the transfer may impact Montana's livestock, native deer and elk populations, or human health. However, in a situation such as the one presented, where the Crow Reservation is wholly within the exterior boundaries of the State of Montana and elk released into the wild onto the Reservation could migrate back into Montana, we conclude § 87-4-414(6), MCA, falls squarely within the quarantine exception to the Commerce Clause. Therefore, we conclude that no violation of the Commerce Clause has been demonstrated.

¶52 For the foregoing reasons, we affirm the permanent injunction issued by the District Court.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices

22

Justice James C. Nelson specially concurs.

¶53 I concur in our Opinion. That said, it is, nonetheless, worth observing that this case represents what can only be described as a serious breakdown in an important part of the regulatory scheme of State government.

¶54 As touched upon in ¶ 33 of our Opinion, the statutes governing FWP's jurisdiction and authority to ensure the health, safety and integrity of Montana's native wildlife population are ultimately grounded in the State's obligation under Article IX, Section 1, of Montana's Constitution to "maintain and improve," for the benefit of "present and future generations," Montanans' Article II, Section 3, fundamental constitutional right to "a clean and healthful environment." *See State v. Boyer*, 2002 MT 33, ¶ 22, 308 Mont. 276, ¶ 22, 42 P.3d 771, ¶ 22, wherein we stated--in upholding a game warden's search for and seizure of over-limit fish in a live well in a boat--that "our Constitution, laws and regulations mandate special considerations to assure that our wild places and the creatures that inhabit them are preserved for future generations."

¶55 It can hardly be gainsaid that if, as the Attorney General argued in *Boyer*, over-fishing implicates the "clean and healthful environment" protections of Montana's Constitution, then, for the reasons set forth in ¶¶ 23-28 of our Opinion, the release of game farm elk into the wild carries with it the potential for an environmental disaster of truly monumental proportions.

¶56 With that in mind, and, recognizing the State's obligation to protect, maintain and

23

improve the environment, it deserves special comment that, at least from the record before us, it appears that there was no communication, much less any consultation or coordination, between DOL and FWP with respect to the Wallaces' proposed transfer of their game farm elk to the Crow Tribe. While Title 87 governs "Fish and Wildlife" and more specifically FWP, § 87-4-408, MCA, cited in ¶ 18 of our Opinion clearly indicates that FWP and DOL have interrelated functions with regard to game farm animals. *See also* § 87-4-414 and § 87-4-415, MCA. In spite of these interrelated functions, each agency--like ships passing in the night--simply did its own thing under the statutes and regulations that pertained to its particular operations. That the involved personnel in these two State agencies failed to acknowledge a need much less any apparent legal requirement, to communicate and coordinate with each other with regard to this matter is mind-boggling given the serious environmental ramifications of allowing game farm elk to mix with, and presumably breed with, Montana's wild elk population.

¶57   In this regard, it might be that DOL would not have permitted the transfer of Wallaces' game farm elk if some sort of pre-permit assessment of environmental impacts had been conducted under Title 75, Chapter 1, Part 2, MCA (the "Montana Environmental Policy Act or MEPA). Of course, on the record here, it appears that DOL was not even aware of the potential environmental threats that had been identified by its sister agency, FWP, and which the Wallaces' intended course of conduct posed. Again, this points up the break down of communication and coordination between the two State agencies involved in this case, and,

24

more importantly, the failure of the State to discharge its constitutional obligation to protect the environment through its agencies and governing regulatory scheme.

¶58 In short, given that Article IX, Section 1, of our Constitution clearly and unambiguously imposes upon the State the obligation to "maintain and improve a clean and healthful environment in Montana for present and future generations," the Legislature, under Article IX, Section 2, has a concomitant obligation to "provide for the administration and enforcement of this duty" by adopting laws that ensure the right hand of State government knows what the left hand is doing.

_____
Justice